## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ : | **CRIM. NO.: 11-cr-142 (RCL)** |
| **UNITED STATES OF AMERICA** : | |
| : | |
| **vs.** : | |
| : | |
| **SHELLY S. SINGHAL,** : | |
| **LORETTA FREDY BUSH, and** : | |
| **DENNIS L. PELINO,** : | |
| : | |
| **Defendants.** : | |
| _____ : | |

## GOVERNMENT'S OMNIBUS OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

The United States of America, through undersigned counsel, submits this Omnibus

Opposition to Defendants' Motions to Dismiss.[1]

---

[1]     This Omnibus Opposition responds to the following motions to dismiss filed on January 30, 2012: (1) Defendant Dennis L. Pelino's Motion to Dismiss Counts Six through Nine for Failure to Allege a Crime Based on the Supreme Court's Recent *Janus* Decision as Specifically Related to the Number of Shares Owned by Defendant Bush (ECF Doc. 39); (2) Defendants' Motion to Dismiss Counts Six through Nine (Alleged False Statements) for Failure to Allege a Matter Within the Jurisdiction of the SEC (ECF Doc. 40); (3) Defendants' Motion to Dismiss Counts One through Nine Based on the Impermissible Extraterritorial Application of 18 U.S.C. §§ 1341 and 1001 (ECF Doc. 41); (4) Defendants' Motion to Dismiss the Indictment for Vagueness as to Applicable Foreign Law and to Compel the Government to Produce the Instructions Used Before the Grand Jury (ECF Doc. 42); (5) Defendants' Motion to Dismiss Counts Two through Five for Failure to Adequately Allege Mail Fraud under 18 U.S.C. § 1341 (ECF Doc. 43); (6) Defendants' Motion to Dismiss Counts Six through Nine for Failure to Allege a Crime Based on the Supreme Court's Recent *Janus* Decision (ECF Doc. 44); (7) Defendants' Motion to Dismiss Counts One through Nine Because These Charges are Unconstitutionally Vague as Applied to These Defendants (ECF Doc. 45); (8) Defendants' Motion to Dismiss Counts Six through Nine for Failure to Allege a Legal Duty to Disclose (ECF Doc. 46); (9) Defendants' Motion to Dismiss Counts Six through Nine for Lack of Materiality (ECF Doc. 47); (10) Defendants' Motion to Dismiss the Indictment for Lack of Venue (ECF Doc. 48); and (11) Defendant Shelly S. Singhal's Motion to Dismiss Counts Six through Nine for Failure to Allege a Crime Based on the Supreme Court's Recent *Janus* Decision as Specifically Related to the Number of Shares Owned by Defendants Bush and Pelino (ECF Doc. 49).

## FACTS

On May 10, 2011, a grand jury returned a ten count Indictment against the defendants.  The Indictment alleged that the defendants engaged in a conspiracy and scheme to defraud the United States Securities and Exchange Commission ("SEC"), investors, and others through a series of undisclosed and disguised related party transactions and insider trading that generated proceeds exceeding $50 million.  Indictment ¶ 1.  Count One charged each defendant with conspiracy to commit mail fraud and submit false statements, in violation of Title 18, United States Code, Section 371.  Counts Two through Five charged each defendant with mail fraud, in violation of Title 18, United States Code, Sections 1341 and 2.  Counts Six through Nine charged each defendant with false statements, in violation of Title 18, United States Code, Section 1001 and 2.  Count Ten charged defendant Dennis L. Pelino with false statements, in violation of Title 18, United States Code, Section 1001.

### A.    Background on Xinhua Finance and the Defendants

According to the Indictment, the alleged conspiracy and scheme to defraud related to transactions involving Xinhua Finance Limited ("Xinhua Finance").  Xinhua Finance provided information products focused on China's financial markets, including market indices, ratings, financial news and analysis, and investor relations.  Indictment ¶ 2.  Xinhua Finance was organized under the laws of the Cayman Islands and headquartered in Shanghai, China.  *Id.*  According to a report it submitted to the SEC, Xinhua Finance "was founded in anticipation of the growing need for transparent and reliable financial information and data flow into and out of China." *Id.*

In October 2004, Xinhua Finance's shares began to trade publicly on the Tokyo Stock Exchange's Mothers Board (market of the high-growth and emerging stocks).  *Id.* ¶ 3.  Xinhua

2

Finance was the first Chinese Initial Public Offering in Japan, the first non-Japanese equity to list on the Mothers Board, and the first time a foreign stock traded in Japan through an international settlement agreement, which allowed investors globally to invest in Xinhua Finance. *Id.*

The Indictment alleged the defendants' connections to Xinhua Finance. According to the Indictment, defendant Loretta Fredy Bush ("Bush") co-founded Xinhua Finance and was its Chief Executive Officer ("CEO") and Vice Chairman of Xinhua Finance's Board of Directors. Indictment ¶ 5. Defendant Dennis L. Pelino ("Pelino"), the other co-founder, served as an independent member of Xinhua Finance's Board of Directors, Chairman of its Compensation Committee, and a member of its Audit Committee and Investment Committee. *Id.* ¶ 6. Defendant Shelly S. Singhal ("Singhal") served as an independent member of Xinhua Finance's Board of Directors, Chairman of its Audit Committee, and a member of its Compensation Committee and Investment Committee. *Id.* ¶ 4. Singhal, through his company, SBI USA, LLC ("SBI USA"), also provided investment advisory services to Xinhua Finance. *Id.* ¶ 7.

B.     **Xinhua Finance's Entry and Involvement in U.S. Capital Markets**

Although listed publicly in Japan, Xinhua Finance had earlier sought access to the capital markets of the United States. Beginning in or around 2003, according to the Indictment, Xinhua Finance began to raise funds from United States investors. *Id.* ¶ 3. Xinhua Finance did not register these offerings with the SEC. *Id.* Instead, Xinhua Finance relied on United States securities laws' limited offering exemptions to registration. Xinhua Finance filed notices with the SEC to qualify for the registration exemptions. *Id.*

After it obtained its public listing in Japan in October 2004, Xinhua Finance sought increased access to the capital markets of the United States. In April 2005, as part of an effort to reach more

investors in the United States, Xinhua Finance began to furnished information to the SEC to obtain an exemption from registration for the offer and sale of securities in the United States. *Id.* ¶¶ 3, 62(u). A few months later, according to the Indictment, Xinhua Finance established in the United States a sponsored Level 1 American Depository Receipt ("ADR") facility. *Id.* ¶ 3. In July 2005, Xinhua Finance issued a global press release announcing that Xinhua Finance had established a sponsored Level 1 ADR facility. *Id.* ¶ 62(u). Bush was quoted in the article stating that Xinhua Finance's "ADR program will provide the opportunity for a wider range of US investors to participate in Xinhua Finance's development." *Id.* Xinhua Finance's ADRs traded on the United States over-the-counter market using the stock trading symbol "XHFNY." *Id.* ¶ 3.

### C.     The Alleged Scheme to Defraud

The Indictment identified various nominees and nominee entities that the defendants used to engage in a number of transactions involving Xinhua Finance. *Id.* ¶¶ 8-22. The defendants used the nominees and nominee entities for the following alleged purposes: (1) to obtain cash, warrants, stock, and other things of value from Xinhua Finance, (2) to sell shares of Xinhua Finance stock owned directly and beneficially by Singhal, Bush, and Pelino; and (3) to transfer assets off of Xinhua Finance's balance sheet to minimize potentially negative impacts to that balance sheet. *Id.* ¶¶ 25-57. The defendants' alleged motivation for using the nominees and nominee entities to engage in the transactions involving Xinhua Finance, rather than engaging in them using their own names or the names of their own companies, was to misrepresent and avoid disclosing the defendants' involvement in the transactions and the sale of their Xinhua Finance shares in statements furnished to the SEC, investors, and others. *Id.* ¶ 61.

4

The Indictment alleged that the defendants and others used the nominees and nominee entities for those purposes and with that alleged motivation to engage in the following transactions involving Xinhua Finance: (1) the Entree Capital transaction; (2) the Bedrock Securities and Bedford transactions; and (3) the Wiremill and Hyperion transactions.

### 1.    The Entree Capital Transaction

All three defendants were allegedly involved in the Entree Capital transaction.  Singhal and Pelino, allegedly through false representations and deceptive practices, obtained a warrant to purchase 6,944 Xinhua Finance shares.  *Id.* ¶¶ 25-27.  Rather than purchase the shares in their own names or in the name of one of their companies, they used a nominee and a fictitious entity, Brightline Capital LLC, to buy the warrant.  *Id.* ¶ 28.  Singhal used nominees, including Robert S. Brown ("Brown"), to exercise the warrant and deposit the 6,944 Xinhua Finance shares into a brokerage account in the name of another nominee entity, Entree Capital LLC ("Entree Capital"). *Id.* ¶ 29.  Following a request by Singhal and Pelino, Bush, as Xinhua Finance's CEO, authorized an acceleration of the lock-up period for the Xinhua Finance shares held by Entree Capital, which allowed Entree Capital (Singhal) to begin selling the Xinhua Finance shares approximately four weeks before investors who held similarly restricted shares.  *Id.* ¶¶ 31, 62(i)-(n).

Singhal and his company, SBI USA, paid Xinhua Finance $1,388,888 of the $5 million exercise price for the 6,944 shares held by Entree Capital.  *Id.* ¶ 32.  The Indictment alleges that, with Pelino's assistance, Singhal attempted to have the exercise price for the shares lowered from $0.36 a share to $0.10 a share.  *Id.* ¶ 62(h).  If successful, the exercise price for the warrants would have totaled $1,388,888.  Although that effort to lower the exercise price of the shares was unsuccessful, the Indictment alleges that Singhal paid the balance of the exercise price for those 6,944 shares –

$3,611,111 – by obtaining the money from Xinhua Finance through another nominee entity controlled by Singhal, Wire Mill Partners II, LLC. That is, Singhal used a nominee, Brown, to direct Xinhua Finance to credit to Entree Capital $3,611,111, which Xinhua Finance purportedly owed originally to Wire Mill Partners II. *Id.* ¶¶ 33, 62(p)-(q).

At Singhal's direction, Entree Capital sold the 6,944 Xinhua Finance shares for total proceeds of approximately $21,700,000. *Id.* ¶ 34. One of Singhal's associates allegedly kept Bush and Pelino apprized of the Xinhua Finance share sales by Entree Capital. *Id.* ¶¶ 62(r), 62(t). Entree Capital, at Singhal's direction, allegedly distributed the proceeds from the share sales for the principal benefit of Singhal, Bush, and Pelino. *Id.* ¶ 35.

As a result of the Entree Capital transaction, the defendants allegedly caused Xinhua Finance to furnish statements to the SEC that misrepresented and failed to disclose: (a) a related party transaction between Xinhua Finance, its CEO (Bush), and members of its Board of Directors (Singhal and Pelino) concerning the acquisition of the warrant, acceleration of the lock-up period, and exercise of the Xinhua Finance shares held by Entree Capital; (b) Singhal, Bush, and Pelino had an ownership interest in the Xinhua Finance shares held by Entree Capital; and (c) Singhal, Bush, and Pelino sold Xinhua Finance shares for proceeds of approximately $21,700,000 through Entree Capital for their personal benefit. *Id.* ¶ 36.

### 2.    The Bedrock Securities and Bedford Transactions

The Indictment alleged that Singhal assisted both Bush and Pelino to engage in undisclosed trading of their Xinhua Finance shares through nominee entities, Bedrock Securities LLC ("Bedrock Securities") and Bedford Proprietary Trading, LLC ("Bedford"), which were allegedly controlled by Singhal. *Id.* ¶¶ 15-16, 37-48. Between January 6, 2006 and May 2008, according to the Indictment,

Singhal assisted Bush in selling 36,736 Xinhua Finance shares beneficially owned by Bush. *Id.* ¶¶ 39-44, 46-47. The share sales generated over $23,000,000 in proceeds. *Id.* ¶ 47. During the same time period, Singhal assisted Pelino in selling 3,914 Xinhua Finance shares owned by Pelino, which generated approximately $2,500,000 in proceeds. *Id.* ¶ 45.

Rather than disclose those share sales, as allegedly required by Xinhua Finance's insider trading and confidentiality policies, *id.* ¶¶ 37-38, Bush allegedly entered into backdated, written agreements with Bedford and a nominee, *id.* ¶ 42. The agreements were allegedly created to give the false appearance that Bush had not sold any of her Xinhua Finance shares and that she had merely pledged them to Bedford for purposes of securing a loan. *Id.* Bedford's operations allegedly consisted of receiving shares belonging to Bush, selling those shares at the direction of Singhal and Bush, and distributing the proceeds for Bush's primary benefit. *Id.* ¶¶ 42-43. As part of this transaction, Singhal allegedly provided false and misleading testimony to the National Association of Securities Dealers ("NASD") during its investigation of Bedrock Securities concerning, among other things, the sale of Bush's Xinhua Finance shares. *Id.* ¶¶ 41, 62(gg).

Singhal allegedly controlled and used the nominee and nominee entities to disguise his involvement in the sale of Bush's Xinhua Finance shares to avoid the obligation of Xinhua Finance to disclose publicly a related party transaction and to engage in undisclosed insider trading. *Id.* ¶ 42. As part of this transaction, according to the Indictment, Singhal and Bush solicited the interest of an investor in the District of Columbia, via emails, concerning the investor's interest in purchasing some of the Xinhua Finance shares from Bedford. *Id.* ¶¶ 62(z)-(ff).

Pelino, unlike Bush, allegedly did not enter into written agreements with Bedford concerning the sale of his 3,919 Xinhua Finance shares.[2]  Instead, Pelino allegedly transferred the shares to Bedford, which sold the shares at Singhal's direction.  *Id.* ¶ 45.  Pelino allegedly used Bedford to conceal and disguise the sale of his Xinhua Finance shares for purposes of, among other things, avoiding the obligation of Xinhua Finance to disclose publicly a related party transaction and engaging in undisclosed insider trading.  *Id.*

As a result of the Bedrock Securities and Bedford transactions, the defendants allegedly caused Xinhua Finance to furnish statements to the SEC that misrepresented and failed to disclose (a) a related party transaction between Xinhua Finance, its CEO (Bush), and members of its Board of Directors (Singhal and Pelino) concerning the sale of Xinhua Finance shares belonging to Bush and Pelino, and (b) the number of Xinhua Finance shares owned directly and beneficially by Bush and Pelino.  *Id.* ¶ 48.

### 3.    The Wiremill Transactions

The Indictment charged that Xinhua Finance entered into agreements with two nominee entities controlled by Singhal, Wire Mill Partners II and Wiremill, in which Xinhua Finance agreed to pay commissions to Wire Mill Partners II and Wiremill in return for them introducing certain transactions to Xinhua Finance.  *Id.* ¶ 49.  The transactions introduced by Wire Mill Partners II and Wiremill to Xinhua Finance included the receipt by Xinhua Finance of securities assets in publicly

---

[2]    Similarly, the Indictment does not allege that Bush entered into a written agreement with Bedford concerning the 10,000 Xinhua Finance shares transferred by her to Bedford from September 2006 through January 29, 2007, which were allegedly sold at Singhal's direction.  *Id.* ¶ 46.

traded companies in consideration for Xinhua Finance providing business development services in China for the various publicly traded companies listed in the United States. *Id.* In the short-term, according to the Indictment, the securities assets received by Xinhua Finance from the various publicly traded companies listed in the United States positively affected Xinhua Finance's balance sheet. *Id.*

Singhal, according to the Indictment, controlled and used Wire Mill Partners II and Wiremill as nominees to disguise Singhal's interest and involvement in the activities of Wire Mill Partners II and Wiremill for purposes of, among other things, avoiding the obligation of Xinhua Finance to disclose publicly a related party transaction. *Id.* ¶ 50.[3] Singhal and Bush allegedly received $5,500,000 and $1,800,000, respectively, from Xinhua Finance via Wire Mill Partners II and Wiremill. *Id.* ¶ 55. As a result of the Wiremill transactions, the defendants allegedly caused Xinhua Finance to furnish statements to the SEC that misrepresented and failed to disclose a related party transaction between Xinhua Finance, its CEO (Bush), and members of its Board of Directors (Singhal and Pelino) concerning the payment of monies from Xinhua Finance to Wire Mill Partners II and Wiremill. *Id.* ¶ 57.

In February 2006, for example, the Indictment alleges that Singhal directed a "round trip" of over $1 million originating from Xinhua Finance and paid back to Xinhua Finance via Singhal's nominee entities to purchase Xinhua Finance shares for Singhal's benefit. That is, according to the

---

[3]     As discussed above concerning the Entree Capital transaction, Xinhua Finance credited $3,611,111 to Wire Mill Partners II in return for transactions purportedly introduced by Wire Mill Partners II to Xinhua Finance. Singhal, in turn, directed Wire Mill Partners II to apply the $3,611,111 to the exercise price for the warrant held by Entree Capital for the benefit of the defendants. *Id.* ¶ 51.

Indictment, Xinhua Finance paid $1,368,463.42 to Wiremill, an entity allegedly controlled by Singhal, which in turn wired $1,290,671.39 to another entity controlled by Singhal, SBI Advisors LLC. *Id.* ¶¶ 13, 21, and 52. To facilitate the transfer, the Indictment alleges that SBI Advisors provided a bogus invoice to Wiremill. *Id.* ¶ 62(ll). SBI Advisors, in turn, wired $1,029,600 to Singhal's company, SBI USA. *Id.* ¶ 62(mm). SBI USA, in turn, wired $1,029,600 to Xinhua Finance to purchase 3,900 Xinhua Finance shares. *Id.* ¶ 62(nn).

The Indictment also alleges that in May 2006, Singhal and Bush used Wire Mill Partners II, Wiremill, an Israeli company, and an Austrian bank account as conduits to make a $1,000,000 payment from Xinhua Finance to Bush. *Id.* ¶ 53. In May 2006, according to the Indictment, Xinhua Finance paid $1,050,000 to Wire Mill Partners II in return for transactions purportedly introduced by Wiremill. *Id.* Wire Mill Partners II, in turn, wired $1,050,000 to Wiremill at Singhal' direction. *Id.* Wiremill, in turn, wired $1,000,000 at Singhal's direction to an account in Austria. The Austrian account, in turn, wired $1,000,000 to an account in China for Bush's benefit. *Id.* To paper the transaction, the Indictment alleges that, at Singhal's direction, identical consulting agreements were executed (1) between Wiremill and an Israeli company, and (2) the Israeli company and Bush, which Bush allegedly signed in New York, New York. *Id.* ¶¶ 62(rr)-(ss).

The Indictment alleges that in December 2006, Singhal and Bush used Wiremill as a conduit to make payments of $683,117 and $800,000 to Singhal and Bush, respectively. *Id.* ¶ 54. Those payments originated from a payment of $1,883,197.50 from Xinhua Finance to Wiremill, which Bush allegedly authorized. *Id.* ¶¶ 54, 62(vv). Wiremill, in turn, wired $683,117 at Singhal's direction to an account under Singhal's control. *Id.* ¶¶ 54, 62(yy). Wiremill separately wired $800,000 at Singhal's direction to a different nominee entity, Tamarack Partners LLC, which was

10

also under Singhal's control. *Id.* ¶¶ 22, 54, 62(zz). Tamarack Partners, in turn, wired the $800,000 to an account in China for Bush's benefit. *Id.* ¶¶ 54, 62(aaa).

### 4.   The Hyperion Transactions

In or around the end of calendar years 2005 and 2006, the securities assets received by Xinhua Finance via Wire Mill Partners II and Wiremill in consideration for Xinhua Finance providing business development services in China for various publicly traded companies listed in the United States posed a negative risk to Xinhua Finance's balance sheet if the securities assets had declined in value. *Id.* ¶ 56. To minimize the potential impact to Xinhua Finance's balance sheet posed by those securities assets and other assets on Xinhua Finance's balance sheet declining in value, Xinhua Finance sold certain of the assets to Hyperion Investments Limited ("Hyperion"), a Bahamian corporation controlled by Singhal. *Id.* ¶¶ 19, 56. The Indictment alleges that Xinhua Finance announced publicly that it had issued a warrant to Hyperion and falsely identified Hyperion as "a third party independent company." *Id.* ¶ 62(kk). Singhal, according to the Indictment, used Hyperion as a nominee to purchase the assets to disguise Singhal's interest and involvement in Hyperion's activities for purposes of, among other things, avoiding the obligation of Xinhua Finance to disclose a related party transaction. *Id.* ¶ 56. As a result of the Hyperion transactions, the defendants allegedly caused Xinhua Finance to furnish statements to the SEC that misrepresented and failed to disclose a related party transaction between Xinhua Finance, its CEO (Bush), and members of its Board of Directors (Singhal and Pelino) concerning the sale of assets from Xinhua Finance to Hyperion. *Id.* ¶ 57.

**ARGUMENT**

I.      **Standard for Deciding a Motion to Dismiss**

An indictment is sufficient if it (1) alleges the essential elements of the offense charged and

provides the defendant with notice of the crime with which he is charged; and (2) enables the

defendant to plead double jeopardy in any future prosecution for the same offense.  *Hamling v.*

*United States*, 418 U.S. 87, 117 (1974).  It is generally sufficient for an indictment to allege the

offense in the words of the statute and state the time and place of the alleged offense so long as the

words of the statute "fully, directly, and expressly, without any uncertainty or ambiguity, set forth

all the elements necessary to constitute the offense." *Russell v. United States*, 369 U.S. 749, 763-64

(1962) (quoting *United States v. Carll*, 105 U.S. 611 (1882)).

II.     **Counts Six through Nine of the Indictment Allege False Statements Within the SEC's**
        **Jurisdiction. [Opp. to ECF Doc. 40-1]**

The defendants have moved to dismiss Counts Six through Nine of the Indictment, which

each charge a violation of 18 U.S.C. § 1001, based on their argument that the reports furnished by

Xinhua Finance to the SEC were not within the jurisdiction of the SEC.  *See* ECF Doc. 40-1.

Under Section 1001, a person "in any matter within the jurisdiction of the executive,

legislative, or judicial branch of the Government of the United States commits an offense if he

knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material

fact." *United States v. Safavian*, 528 F.3d 957, 963 (D.C. Cir. 2008) (internal quotation omitted).[4]

_____

[4]      Section 1001(a) provides, in relevant part, that "whoever, in any matter within the
jurisdiction of the executive, legislative, or judicial branch of the Government of the United
States, knowingly and willfully (1) falsifies, conceals, or covers up by any trick, scheme, or
device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or
representation; or (3) makes or uses any false writing or document knowing the same to contain
any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title,

This statute was designed "to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *United States v. Gilliland*, 312 U.S. 86, 93 (1941). An indictment sufficiently charges the crime of false statement if it alleges that "(1) defendant made a statement; (2) the statement was false, fictitious, or fraudulent as far as the defendant knew; (3) the statement was made knowingly and willfully; (4) the statement was made in a matter within the jurisdiction of the executive, legislative, or judicial branch of the U.S. Government; and (5) the statement was material." *United States v. Pickett*, 209 F. Supp. 2d 84, 87 (D.D.C. 2002); *see also United States v. Crop Growers Corp.*, 954 F. Supp. 335, 349 (D.D.C. 1997).

The Supreme Court has stated that jurisdiction within the meaning of Section 1001 should be broadly construed. *United States v. Rodgers*, 466 U.S. 475, 479-80 (1984) ("jurisdiction" term should be treated as broadly as possible); *Bryson v. United States*, 396 U.S. 64, 71 (1969) ("the term 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001"). An agency has jurisdiction within the meaning of the statute when it has authority to act upon the information. *Rodgers*, 466 U.S. at 479-80; *United States v. Bilzerian*, 926 F.2d 1285, 1300 (2d Cir. 1991). "A statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under § 1001." *Bryson*, 396 U.S. at 71; *United States v. Gafyczk*, 847 F.2d 685, 690 (11th Cir. 1988) (jurisdiction under § 1001 is satisfied when documents are "commonly utilized by the [U.S. Customs] Service in the performance of its regularly conducted activities"); *United States v. Hansen*, 772 F.2d 940, 943-44 (D.C. Cir. 1985) ("the term 'jurisdiction' in § 1001 embraces the authority to conduct an official inquiry"). Further, Section 1001 is "necessarily

---

imprisoned not more that 5 years."

13

couched in very broad terms to encompass the variety of deceptive practices which ingenious individuals might perpetrate upon an increasingly complex government." *United States v. Royal Caribbean Cruises Ltd.*, 11 F. Supp. 2d 1358, 1364 (S.D. Fla. 1998) (jurisdiction under § 1001 proper for misstatements and omissions in reports submitted to U.S. Coast Guard in port in Florida, even though misstatements and omissions were made in the reports while in international waters).

The Indictment alleged that the defendants caused Xinhua Finance to submit false statements to the SEC in certain annual and semi-annual reports of Xinhua Finance. The defendants contend that the "substance of the materials that Xinhua Finance furnished to the SEC was based on foreign law and there was no requirement whatsoever to conform those materials to U.S. securities laws." ECF Doc. 40-1 at p. 3; *id.* at p. 5 (Xinhua Finance's only requirement was "to furnish English-language versions of material it had already filed in foreign jurisdictions"). Contrary to the defendants' arguments, however, the SEC's regulations required Xinhua Finance to furnish to the SEC (1) the annual and semi-annual reports, and (2) "information material to an investment decision." *See* 17 C.F.R. §§ 240.12g3-2(b)(1) and (3).

The Indictment alleged that Xinhua Finance established a sponsored Level 1 ADR facility in July 2005. Indictment ¶ 3. ADRs were created in 1927 to assist American investors who wanted to invest internationally, but were reluctant to do so due to regulatory and currency exchange

difficulties.[5]  ADRs offer significant benefits to foreign companies, allowing them to tap into the

American capital market.  *Id.*

SEC Form F-6 governs the registration of ADRs.  *See* 17 C.F.R. § 239.36.  The filing of a

Form F-6 is required to establish an ADR facility.  Form F-6 requires that the registrant disclose

important information related to the issuance of the ADR, including the terms of the depository

agreement (if any), material contracts between the depository and the issuer, and an opinion of

counsel regarding the legality of the ADRs.  *See Pinker*, 292 F.3d at 367 (citing Hertz at 288).

The eligibility criteria for the use of a Form F–6 include the requirement that the issuer of

the deposited securities have a reporting obligation under either Section 13(a) of the United States

Securities Exchange Act of 1934 (the "Exchange Act") or have established an exemption under Rule

12g3–2(b) of the Exchange Act.  ADRs that are traded on American securities exchanges must abide

by the periodic reporting requirements imposed by the Exchange Act.  *See Pinker*, 292 F.3d at 367

(citing Hertz at 288-89).  ADRs that are not traded on the exchanges, such as Xinhua Finance's, are

not subject to the Exchange Act's reporting requirements, but must establish an exemption under

---

[5]     *See Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (2d Cir. 2002) (citing Melissa Wilverding, *Depository Receipts*, II *Global View* (Brown Brothers Harriman), 2001, at 3).  An ADR is a receipt that is issued by a depository bank that represents a specified amount of a foreign security that has been deposited with a foreign branch or agent of the depository, known as the custodian.  *Id.* (citing Bruce L. Hertz, *American Depository Receipts*, 600 P.L.I./Comm. 237, 239 (1992)).  The holder of an ADR is not the title owner of the underlying shares; the title owner of the underlying shares is either the depository, the custodian, or their agent.  *Id.* (citing Hertz at 241).  The structure makes trading an ADR simpler and more secure for American investors than trading in the underlying security in the foreign market.  *Id.* (citing Hertz at 240).  ADRs may be either sponsored or unsponsored.  An unsponsored ADR is established with little or no involvement of the issuer of the underlying security.  A sponsored ADR is established with the active participation of the issuer of the underlying security.  *Id.* (citing Hertz at 242-43).  An issuer who sponsors an ADR enters into an agreement with the depository bank and the ADR owners.  *Id.* (citing Hertz at 243).

Rule 12g3–2(b).  That is, the Rule 12g3-2(b) exemption is a condition to a foreign private issuer's equity securities trading over-the-counter in the United States in the form of ADRs.

Pursuant to these requirements, Xinhua Finance filed a Form F-6 registration statement with the SEC in July 2005 to register 20,000,000 ADRs.  The Form F-6 included a copy of the depository agreement with the depository bank, The Bank of New York, and a legal opinion by the depository bank's counsel.[6]  The Form included the electronic signatures of Singhal, Bush, and Pelino, "[p]ursuant to the requirements of the Securities Act of 1933," in their respective capacities as Director, Director and Principal Executive Officer, and Director.  Because Xinhua Finance did not seek to trade its ADRs on an American securities exchange, such as NASDAQ, its ADRs were not subject to the periodic reporting obligations of the Exchange Act.  Instead, Xinhua Finance offered its securities for sale in the United States on the over-the-counter market.

Absent registering the shares to trade on one of the exchanges, Xinhua Finance needed an exemption from registration to offer its securities for sale in the United States on the over-the-counter market.  The exemption relied upon by Xinhua Finance to offer its securities for sale in the United States was the exemption provided to foreign issuers under Rule 12g3-2(b).  At the time that Xinhua Finance furnished the materials at issue here to the SEC, this Rule provided that "[s]ecurities

---

[6]     A copy of Xinhua Finance's Form F-6 is available publicly at the following: http://www.sec.gov/Archives/edgar/data/1287221/000101915505000153/xinhuaf6.htm.  In passing on a motion to dismiss, the court may not look beyond the allegations of the indictment. *See United States v. Syring*, 522 F. Supp. 2d 125, 128 (D.D.C. 2007). However, as defendants repeatedly note, *see* ECF Doc. 41-1 at 6, ECF Doc. 42-1 at 5 n.4, the Court may consider any facts that are properly the subject of judicial notice. *See*, *e.g.*, *United States v. Bryant*, 556 F. Supp. 2d 378, 439 n.31 (D.N.J. 2008).  Plainly, the contents of such a public filing may properly be considered by the Court.

of any foreign private issuer shall be exempt from section 12(g)" of the Exchange Act if the issuer

complied with the following mandates:

> (i)      Shall furnish to the Commission whatever information in each of the following categories the issuer since the beginning of its last fiscal year (A) has made or is required to make public pursuant to the law of the country of its domicile or in which it is incorporated or organized, (B) has filed or is required to file with a stock exchange on which its securities are traded and which was made public by such exchange, or (C) has distributed or is required to distribute to its security holders; [and] . . . .

> (iii)     Shall furnish to the Commission, during each subsequent fiscal year, whatever information is made public as described in paragraphs of paragraph (b)(1)(i)(A), (B) or (C) of this section promptly after such information is made or required to be made public as described therein.

17 C.F.R. §§240.12g3-2(b)(1)(i) and (iii) (2007).[7]

The Rule 12g3-2(b) exemption provided the following mandate regarding the timing and

notice for the submission of the information to the SEC:

> The information required to be furnished under paragraphs (b)(1)(i) . . . of this section shall be furnished on or before the date on which a registration statement under section 12(g) of the [Exchange] Act would otherwise be required to be filed.  Any issuer furnishing the information under paragraph (b)(1)(i) of this section shall notify the Commission that it is furnished under that paragraph.

17 C.F.R. § 12g3-2(b)(2) (2007).

In addition to the information required to be furnished by the foreign issuer under Rule 12g3-

2(b)(1)(i) and (iii), the exemption "required" the foreign issuer to furnish to the SEC "information

---

[7]      Rule 12g3–2(b) was amended effective October 10, 2008.  The amendment removed the requirement that the foreign private issuer submit copies of this information to the SEC.  The amendment required that the issuer publish the information in English, on its Internet Web site, or through an electronic information delivery system generally available to the public in its primary trading market.  17 C.F.R. § 240.12g3-2(b) (2011).  The Xinhua Finance filings that form the basis for the crimes alleged in the Indictment pre-date the amendment.

material to an investment decision," which specifically included "remuneration to directors or officers" and "transactions with directors, officers or principal security holders":

> The information *required* to be furnished under this paragraph (b) is information material to an investment decision such as: *the financial condition or results of operations*; changes in business; acquisitions or dispositions of assets; issuance, redemption or acquisitions of their securities; changes in management or control; *the granting of options or the payment of other remuneration to directors or officers; and transactions with directors, officers or principal security holders*.

17 C.F.R. §12g3-2(b)(3) (2007) (emphasis added).[8]

The legislative history for Rule 12g3-2(b) explained the natural consequence – loss of the exemption – for foreign issuers that failed to comply with these requirements: "The exemption will continue so long as all such information continues to be furnished promptly after it is made public or sent to security holders." 32 Fed. Reg. 7,846 (May 30, 1967). The loss of exemption would leave the foreign issuer with four choices: (a) register the securities under the Exchange Act (and file the attendant periodic reports); (b) find another applicable exemption to registration; (c) cease offering the securities for sale in the United States; or (d) risk criminal and civil penalties for offering unregistered and non-exempt securities for sale in the United States. As a result, the SEC had jurisdiction over the reports furnished by Xinhua Finance to the SEC under Rule 12g3-2(b) as a

---

[8]     The 2008 amendments to the Rule did not change the requirement to publish such material information. *See* 17 C.F.R. § 240.12g3-2(b)(3)(i) (2011) ("The information *required* to be published electronically under paragraph (b) [17 C.F.R. § 240.12g3-2(b)] is *information that is material to an investment decision regarding the subject securities*, such as information concerning: (A) Results of operations or financial condition; (B) Changes in business; (C) Acquisition or dispositions of assets; (D) The issuance, redemption or acquisition of securities; (E) Changes in management or control; (F) *The granting of options or the payment of other remuneration to directors or officers; and (G) Transactions with directors, officers or principal security holders*.") (emphasis added). The exemption remains in effect until, among other things, the "issuer no longer satisfies the electronic publication condition of paragraph (b)(2) of this section." 17 C.F.R. § 240.12g3-2(c)(1) (2011).

result of the Company's efforts to obtain and retain its exemption from registration and, thus, to realize its intent to offer ADRs to large numbers of potential investors in the United States. *See United States v. Bilzerian*, 926 F.2d 1285, 1301 (2d Cir. 1991) ("The securities laws are designed to make accurate information available to the investing public; the SEC's authority to regulate disclosure required under those laws brings the securities filings at issue within its jurisdiction for purposes of § 1001."); *United States v. Hansen*, 772 F.2d 940, 943-44 (D.C. Cir. 1985) (the term "jurisdiction" in § 1001 embraces the authority to conduct an official inquiry).

In addition to being subject to the SEC's jurisdiction under the Exchange Act for monitoring compliance with Section 13(a) and Rule 12g3-2(b) of the Exchange Act, the reports furnished by Xinhua Finance to the SEC were subject to the SEC's jurisdiction under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Section 10(b) and Rule 10b-5 relate to a core SEC function of regulating securities registered on a national securities exchange or any security not so registered. Section 10(b) provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as [the SEC] may prescribe . . . .

15 U.S.C. § 78j(b).

Rule 10b-5 makes it unlawful:

> for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a)      To employ any device, scheme, or artifice to defraud,

19

(b)     To make any untrue statement of a material fact or to omit to state a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

By their terms, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder regulate manipulative activities conducted with respect to an over-the-counter security. *See Securities & Exchange Comm'n v. Sayegh*, 906 F. Supp. 939, 946 (S.D.N.Y. 1995) ("When manipulative conduct is engaged in with respect to an OTC [over-the-counter] security, that conduct violates § 10(b) of the Exchange Act and Rule 10b-5 thereunder.") (citing *Securities & Exchange Comm'n v. Resch-Cassin & Co.*, 362 F. Supp. 964, 975 (S.D.N.Y. 1973) ("It is well settled that the manipulative activities expressly prohibited by § 9(a)(2) of the Exchange Act[, 15 U.S.C. § 78i (a),] with respect to a listed security are also violations of . . . Section 10(b) of the Exchange Act when the same activities are conducted with respect to an over-the-counter security.")).   As the Supreme Court stated in *Morrison v. National Australia Bank Ltd.*, ___ U.S. ___, 130 S. Ct. 2869 (2010):

Section 10(b) does not punish deceptive conduct, but only deceptive conduct "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered."   Those purchase-and-sale transactions are the objects of the statute's solicitude.   It is those transactions that the statute seeks to "regulate[]"; it is parties or prospective parties to those transactions that the statute seeks to "protect[.]" And it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies.

*Id.* at 2884 (citations omitted).   Because Xinhua Finance furnished its reports to the SEC in connection with the purchase and sale of its ADRs on the over-the-counter market in the United States, the SEC had jurisdiction to regulate such transactions under Section 10(b) and Rule 10b-5.[9]

Nor does it matter, as the defendants contend, that Xinhua Finance may not have been required to furnish the materials to the SEC to establish an exemption under Rule 12g3-2(b) because it arguably had fewer than 300 U.S. investors during the relevant time period.  *See* ECF Doc. 40-1 at pp. 19-20.  Even assuming that Xinhua Finance had fewer than 300 U.S. investors during the relevant time period, the fact remains that Xinhua Finance actually furnished materials to the SEC to obtain and retain an exemption from registration and periodic reporting pursuant to Rule 12g3-2(b).  As alleged, those materials were false.  As also alleged, the defendants intended to use Xinhua Finance's ADR program to "provide the opportunity for a wider range of US investors to participate in Xinhua Finance's development."  Indictment ¶ 62(u); *see also Pinker*, 292 F.3d at 371 ("The aim of sponsoring an ADR, after all, is to allow American investors to trade equities of a foreign corporation domestically.").   The reach of the SEC (and attendant criminal prosecutions), if otherwise appropriate, is not limited because the perpetrators failed to achieve their alleged aim of cheating a wider range of American investors.  *See Morrison*, 130 S. Ct. At 2884 ("it is parties or

---

[9]      The cases relied upon by the defendants, which related to statements that were not filed directly with the regulating agency, are inapposite.  *See* ECF Doc. 40-1 at pp. 9-11 (citing *United States v. Holmes*, 111 F.3d 463, 465 (6th Cir. 1997) (fraudulent claims filed with Michigan Employment Security Commission, and not the regulating federal agency, U.S. Department of Labor); *United States v. Ford*, 639 F.3d 718, 719 (6th Cir. 2011) (alleged failure to file statements with the Tennessee Senate and Tennessee Registry of Election Finance, and not the regulating federal department, U.S. Department of Health and Human Services); *United States v. Holstrom*, No. 06-30008, 2007 U.S. App. LEXIS 12329 (9th Cir. 2007) (false time cards submitted to defendant's employer, and not the regulating federal department, U.S. Department of Energy)).

prospective parties to these transactions that [Section 10(b)] seeks to 'protect'"). Conduct involving allegedly false material information submitted to the SEC concerning a class of securities available for sale to United States investors and made for the specific purpose of gaining access to American capital markets is not "peripheral to the business of" the SEC. *United States v. Rodgers*, 466 U.S. 475, 479 (1984).[10] Instead, as discussed above, given that the defendants allegedly caused Xinhua Finance to furnish the false materials to the SEC, the SEC had jurisdiction to regulate the content of those materials under Rule 12g3-2(b), as it existed at the time of those furnishings and today, and under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## III.    Counts One through Nine of the Indictment are not Based on an Impermissible Extraterritorial Application of 18 U.S.C. §§ 1341 and 1001. [Opp. to ECF Doc. 41-1]

The defendants have moved to dismiss Counts One through Nine of the Indictment arguing that those counts are based on an impermissible extraterritorial application of 18 U.S.C. §§ 1341 and 1001. *See* ECF Doc. 41-1. Here, as in the defendants' motion to dismiss the Indictment based on the SEC's purported lack of jurisdiction, *see* ECF Doc. 40-1, the fundamental premise of the defendants' argument is that "Xinhua Finance is not subject to U.S. securities laws," ECF Doc. 41-1 at p. 2. As discussed above, however, the SEC has jurisdiction over the materials furnished through Xinhua Finance pursuant to Rule 12g3-2b as well as Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.[11] Thus, the defendants' arguments on extraterritoriality miss their intended mark.

---

[10]    *See also Roche*, 292 F.3d at 373 (allowing an issuer of ADRs in a civil fraud case "to escape the personal jurisdiction of the federal courts would in essence nullify the regulatory protection that American investors seek when they purchase ADRs").

[11]    The defendants' contention that the SEC "could take no action, with respect to the substance of the submissions, as long as the furnishings were true and accurate copies of what was submitted to foreign stock exchanges or which was made public pursuant to the law of the country where it was domiciled," *see* ECF Doc. 41-1 at p. 23, reflects the defendants' continued

Instead, their arguments, particularly their reliance on *Morrison*, 130 S. Ct. 2869 (2010),

demonstrate the sufficiency of the counts in the Indictment.  *Morrison* held that Section 10(b) of the

Exchange Act did not apply to foreign plaintiffs suing foreign and American defendants for

misconduct in connection with securities trading on foreign exchanges.  In so holding, however, the

Court distinguished the reach of Section 10(b) for trading in securities of National Australian Bank

on foreign exchanges from trading in those same securities on an American exchange.  The Court

noted that an American investor in National's ADRs, Robert Morrison, also brought suit, but his

claims were dismissed by the District Court because he failed to allege damages.  *Id.* at 2876 n.1.

The Court, however, repeatedly discussed that Section 10(b) would apply to any such domestic

trading in National's ADRs.  *Id.* at 2884 ("it is in our view only transactions in securities listed on

domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies").[12]

---

attempt to elevate form over substance.  If form were to matter to the exclusion of all else and
such furnishings really were intended to be nothing more than mirror images of filings in foreign
countries, regardless of their substance or integrity, then Congress had no reason to make them
subject to Section 10(b) of the Exchange Act, or to allow them to remain subject to Rule 10b-5
thereunder, and the SEC had no reason to mandate at the time that such furnishings include
"information material to an investment decision," as provided in 17 C.F.R. § 240.12g3-2(b)(3)
(2007), or to continue to mandate that such furnishings include "information that is material to an
investment decision," as provided in 17 C.F.R. § 240.12g3-2(b)(3) (2011).  The defendants'
efforts to impute to the SEC a willingness to administer permissively attempts to commit fraud
on American investors should not be countenanced.

[12]     The defendants' contention that "the *Morrison* case involved a company that
listed ADRs in the United States" but that "was not enough to constitute the sale or purchase of
securities in the United States," *see* ECF Doc. 41-1 at p. 14, is misleading.  It is true that National
listed ADRs in the United States, but that listing had nothing to do with the Court's decision in
*Morrison* that Section 10(b) did not reach foreign plaintiffs purchasing securities on foreign
exchanges.  As stated above, the Court in *Morrison* specifically noted that it was not addressing
the potential Section 10(b) claims of an American investor in National's ADRs.  *Morrison*, 130
S. Ct. at 2876 n.1.

As with those types of domestic transactions, the transactions that are at the heart of the charges here – use of the mails and false statements – occurred in the United States and, more particularly, in the District of Columbia.   The Indictment specifically alleged that part of the defendants' scheme to defraud included "furnish[ing] statements to the SEC, investors and others" that (a) "misrepresented and omitted related party transactions," *see* Indictment ¶ 61.g, and (b) "misrepresented the number of shares owned directly and beneficially" by Bush and Pelino, *id.* ¶ 61.h.   The Indictment identified the specific reports furnished to the SEC in the District of Columbia that allegedly contained the false and misleading statements.   *Id.* ¶¶ 62.bbb-hhh.   Both the mail fraud counts and the false statements counts incorporated those allegations by reference.   *Id.* ¶¶ 63, 65, 67, 69, and 71.   Further, the mail fraud counts also specifically alleged that the scheme to defraud related to "reports furnished to the SEC and investors" and "appeared in . . . mailings to the SEC in Washington, D.C."   *Id.* ¶ 64.

The fact that those mailings and statements originated in China or Japan is irrelevant for purposes of determining the sufficiency of the Indictment.   *See Pasquantino v. United States*, 544 U.S. 349 (2005) (defendants who ordered liquor over the phone from a store in Maryland with intent to smuggle it into Canada and deprive the Canadian government of revenue violated wire fraud statute, 18 U.S.C. § 1343, because the "offense was complete the moment they executed the scheme inside the United States");[13] *United States v. Mandell*, No. (S1) 09 CR. 0662 (PAC), 2011 WL 924891, at *5 (S.D.N.Y. Mar. 16, 2011) (in securities, wire, and mail fraud conspiracy the "fact that defendants engaged in some conduct abroad does not mean that that conduct and conduct here in the

---

[13]      As the defendants acknowledge, the wire fraud statute and the mail fraud statute are construed similarly.   ECF Doc. 41-1 at p. 8 n.5 (citing cases).

United States is not covered by the mail and wire fraud statutes"); *United States v. Cox*, 696 F.2d

1294 (11th Cir. 1983) (upholding conviction for § 1001 violation where relevant documents filled

out in Guatemala); *United States v. Godinez*, 922 F.2d 752 (11th Cir. 1991) (upholding convictions

under § 1001 for making false statements in connection with importation of goods where invoices

describing shipments were filled out in Latin America and the alleged false statement was contended

to be a true statement in the exporting country).  As recognized in *Royal Caribbean Cruises*:

> To find to the contrary would raise serious questions about the government's
> ability to enforce, as a matter of domestic law, false statements made in
> connection with such matters as bank fraud, immigration, and visa cases,
> where the false statements at issue were made outside the United States,
> perhaps acceptable or in the alternative unnecessary under the appropriate
> foreign regulatory scheme, but nonetheless illegal under United States law.

11 F. Supp. 2d at 1364 (false statements statute applied to misstatements and omissions in reports

submitted to U.S. Coast Guard in port in Florida, even though the misstatements and omissions were

made in the reports while in international waters).  Thus, the focus of the charged offenses is not on

regulating foreign securities exchanges, but on ensuring that companies that access American capital

markets – like Xinhua Finance – through the offer and sale of securities in the United States do so

without violating the laws passed by Congress, the rules and regulations promulgated by the SEC,

and the rights of American investors who such companies actively and intentionally seek out.  *See*

*United States v. Mandell*, 2011 WL 924891 at *5 ("use of a foreign exchange, which perhaps has

lighter or reduced regulation, should not be allowed to exempt the crimes" of mail and wire fraud).

Nor should the Court accept the defendants' invitation, based on language in a line of

S.D.N.Y. cases, to conclude that the "[t]rade in ADRs is considered to be a predominately foreign

securities transaction."  ECF Doc. 41-1 at p. 15 (quoting *In re Societe Generales Secs. Litig.*, 2010

U.S. Dist. LEXIS 107719 (S.D.N.Y. Sept. 29, 2010) (citing *Copeland v. Fortis*, 685 F. Supp. 2d 498,

506 (S.D.N.Y. 2010)).  *Copeland* quoted language from *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 561 (S.D.N.Y. 2008), for its contention that trading in ADRs is a "predominantly foreign securities transaction."  But the court in *SCOR Holding* was "[a]ssuming" that the purchase of both ADRs *and* the purchase of securities on a foreign exchange "may be viewed as predominantly foreign securities transactions."  *SCOR Holdings*, 537 F. Supp. 2d at 561.

To assume, however, that the purchase and sale of ADRs by American investors is a "predominantly foreign securities transaction" ignores the name of the securities – *American Depository Receipts* – and the their intended purpose "to tap into the American capital market."  *Roche*, 292 F.3d at 367.  Although the issuer ultimately behind an ADR is a foreign company, the underlying securities transaction is uniquely and predominantly American.  In this regard, Xinhua Finance's then-CEO, Bush, in announcing the establishment of Xinhua Finance's ADR facility through The Bank of New York, focused on the predominant effect for American investors by heralding "the opportunity for a wider range of US investors to participate in Xinhua Finance's development."  Indictment at ¶ 62(u).[14]

## IV.   Counts Six through Nine of the Indictment Should Not be Dismissed for Failure to Allege a Crime Based on the Supreme Court's Recent *Janus* Decision. [Opp. to ECF Doc. 39-1, 44-1, and 49-1]

The defendants have moved to dismiss Counts Six through Nine of the Indictment based on their arguments that those counts fail to allege a crime based on the Supreme Court's recent decision

---

[14]    As discussed above, the defendants' contention that the "SEC had no interest in the content of the reports, and certainly no interest in any supposed related party transaction or reports on ownership of Xinhua Finance shares," *see* ECF Doc. 41-1 at p. 24, ignores the specific mandate in Rule 12g3-2b(3) that such reports include "information material to an investment decision such as," among other things, "changes in management or control," "the granting of options or the payment of other remuneration to directors or officers," and "transactions with directors, officers or principal security holders."  17 C.F.R. § 240.12g3-2b(3) (2007).

in *Janus Capital Group, Inc. v. First Derivative Traders,* ___ U.S. ___, 131 S. Ct. 2296 (2011). *See* ECF Doc. 44-1. Defendant Pelino filed a separate motion to dismiss Counts Six through Nine for failure to allege a crime based on the *Janus* decision as specifically related to the number of shares owned by Bush. *See* ECF Doc. 39-1. Defendant Singhal filed a separate motion to dismiss Counts Six through Nine for failure to allege a crime based on the *Janus* decision as specifically related to the number of shares owned by Bush and Pelino. *See* ECF Doc. 49-1. As demonstrated below, the defendants' argument that the Supreme Court's analysis of Rule 10b-5 in *Janus* "applies equally to 18 U.S.C. § 1001," see ECF Doc. 44-1 at 7, is without merit.

In *Janus*, the issue before the Court was whether a mutual fund advisor, Janus Capital Management LLC ("JCM"), could be liable in a private action under Rule 10b-5 for false statements included in its client mutual funds' prospectuses. Noting that Section 10(b) involved an implied private right of action and the "[c]oncerns with the judicial creation of a private cause of action caution against its expansion," *Janus*, 131 S. Ct. at 2302 (quoting *Stoneridge Investment Partners, LLC v. Scientific -Atlanta, Inc.*, 552 U.S. 148, 165 (2008)), the Court held that it "must give 'narrow dimensions . . . to a right of action Congress did not authorize when it first enacted the statute and did not expand when it revised the law,'" *Janus*, 131 S. Ct. at 2302 (quoting *Stoneridge Investment Partners*, 552 U.S. at 167). Mindful of those narrow dimensions, the Court held that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 131 S. Ct. at 2302. The Supreme Court stated that this rule followed from *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), which held that Rule 10b-5's private right of action does not include suits against aiders and abetters, *id.* at 180. Such suits – against entities that

27

contribute "substantial assistance" to the making of a statement but do not actually make it – may be brought by the SEC, but not by private parties.  *See* 15 U.S.C. § 78t(e).

Try as they might, the defendants simply cannot equate the language in Section 1001 to Rule 10b-5.  Unlike an implied private right of action under Rule 10b-5, there are no similar policy nor precedential reasons to confine the reach of Section 1001 in a criminal prosecution.  By its statutory language, Section 1001 prohibits  "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully":

> (1)     falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>
> (2)     makes any materially false, fictitious, or fraudulent statement or representation; or
>
> (3)     makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

18 U.S.C. § 1001.  Even if there were authority to equate the term "make" as used in a regulation promulgated by an agency with the term "makes" in a criminal statute enacted by Congress – which there is not – two of the three objects of Section 1001 are not dependent on the term "make[]." Counts Six through Nine allege that the defendants engaged in each object of Section 1001.  *See* Indictment at ¶¶ 66, 68, 70, and 72.  In addition, Counts Six through Nine further allege that the defendants aided and abetted a violation of Section 1001.  *See id.*

The defendants' argument that the "responsibility and authority over 'whether and how to communicate' the content of Xinhua Finances's securities filings . . . rested with the Company and its counsel, not the Defendants," see ECF Doc. 44-1, once again elevates form over substance.  The aiding and abetting statute precludes a criminal defendant from elevating form over substance and escaping liability through the use of intermediaries.  *See United States v. Hsia*, 176 F.3d 517, 522

(D.C. Cir. 1999) ("The natural reading of §§ 2(b) and 1001 is this: the government may show mens

rea simply by proof (1) that the defendant knew that the statement to be made were false (the mens

rea for the underlying offense - § 1001) and (2) that the defendant intentionally caused such

statements to be made by another (the additional mens rea for § 2(b)).").[15]   Xinhua Finance was

hardly "an independent entity" from Bush, its CEO, and Singhal and Pelino, its board members and

Chairs of the Audit Committee and Compensation Committee, respectively.  *See Janus*, 131 S. Ct.

at 2304.  The annual and semi-annual reports furnished to the SEC, which formed the basis for

Counts Six through Nine, identified Bush, as Xinhua Finance's CEO, as the "Representative of

Company."[16]  It was the defendants' direct connection to the Company that, according to the

---

[15]    The Indictment also alleged facts connecting Singhal and Pelino, jointly and individually, to the misrepresentations and omissions concerning the number of shares owned directly and beneficially by Bush.  The Indictment alleged that all three defendants used nominee entities to, among other things, engage in insider trading, *see* Indictment ¶ 61.c, caused Xinhua Finance to furnish statements to the SEC, investors, and others that misrepresented and omitted related party transactions, *id.* ¶ 61.g, and caused Xinhua Finance to furnish statements to the SEC, investors, and others that misrepresented the number of shares owned directly and beneficially by Bush and Pelino, *id.* ¶ 61.h.  The Indictment also alleged that Singhal misrepresented and concealed from the SEC, investors, and others his control over the nominee entities, *id.* ¶ 61.b, alleged that defendants Singhal and Bush used the nominee entities to conceal and disguise the sale of Xinhua Finance shares owned directly and beneficially by Bush, *id.* ¶ 61.d, alleged in detail Singhal's role in arranging for the nominee entities (Bedrock Securities and Bedford Proprietary Trading) to engage in the trading for the benefit of Bush and Pelino, *id.* ¶¶ 37-47, and alleged that all three defendants caused Xinhua Finance to furnish statements to the SEC that misrepresented and failed to disclose (a) a related party transaction between Xinhua Finance and the defendants concerning the sale of Xinhua Finance shares belonging to Bush and Pelino, and (b) the number of shares owned directly and beneficially by Bush and Pelino, *id.* ¶ 48.  In addition, the Indictment alleged that all of the defendants caused Xinhua Finance to furnish reports to the SEC that provided false and misleading information concerning related party transactions and the number of Xinhua Finance shares owned directly and beneficially by Bush and Pelino.  *Id.* ¶¶ 62.eee-hhh.

[16]    *See* ECF Doc. 40-3 at p. 3 (Annual Securities Report for 1/01/2005-12/31/2005) (Count Six); http://sec.gov/Archives/edgar/vprr/07/9999999997-07-005563 (Semi-Annual Securities Report for 1/01/2006-6/30/2006) (Count Seven); and

Indictment, motivated their use of nominees to mask their involvement in transactions with Xinhua Finance and sales of Xinhua Finance shares, which ultimately caused Xinhua Finance to make false statements in the reports furnished by the Company to the SEC. *See, e.g.,* Indictment at ¶¶ 61.a-h.

In addition, contrary to the defendants' arguments that the government must show "that Defendants had *actual* knowledge of the content of the materials furnished to the SEC," *see* ECF Doc. 44-1 at p. 15, "there is no basis for requiring proof that the defendant had actual knowledge of federal agency jurisdiction" under Section 1001. *United States v. Yermian*, 468 U.S. 63, 69 (1984). In *Yermian*, the Supreme Court ruled that the statutory language in Section 1001 requiring that knowingly false statements be made "in any matter within the jurisdiction of any department or agency of the United States" is a jurisdictional requirement, and "the statutory language makes clear that Congress did not intend the terms 'knowingly and willfully' to establish the standard of culpability for the jurisdictional element of § 1001." *Id.* "On its face, therefore, § 1001 requires that the Government prove that false statements were made knowingly and willfully, and it unambiguously dispenses with any requirement that the Government also prove that those statements were made with actual knowledge of federal agency jurisdiction." *Id.* at 69-70; *see also United States v. Feola*, 420 U.S. 671, 676-77 (1975) ("the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute").[17]

---

http://sec.gov/Archives/edgar/vprr/07/9999999997-07-032041 (Annual Report for 1/01/2006-12/31/2006) (Count Eight); http://sec.gov/Archives/edgar/vprr/07/9999999997-07-051792 (Semi-Annual Report for 1/01/2007-6/30/2007) (Count Nine).

[17]     In *Yermian*, the district court had instructed the jury, without objection from the prosecution, that the Government must prove that the defendant "knew or should have known" that his false statements were made within the jurisdiction of a federal agency. *Id.* at 75 n.14.

**V.      Counts Six through Nine Should Not be Dismissed for Failure to Allege a Duty to Disclose. [Opp. to ECF Doc. 46-1]**

The defendants have moved to dismiss Counts Six through Nine of the Indictment arguing that those counts fail to allege a legal duty to disclose.  *See* ECF Doc. 46-1.  Here, as in the defendants' other motions to dismiss, *see* ECF Doc. 40-1 and 41-1, the fundamental premise of the defendants' argument is that "the instant Indictment does not allege – nor could it – that the SEC required disclosures regarding related party transactions and the number of shares owned by Ms. Bush and Mr. Pelino in the Xinhua Finance reports."  ECF Doc. 46-1 at p. 8.  As discussed above, the SEC has jurisdiction over the materials furnished to it under Rule 12g3-2b(3) as well as Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Thus, defendants' arguments are meritless.

Contrary to the defendants' initial argument, the alleged false statements counts are not just "based on the *concealment* of information."  *See* ECF Doc. 46-1 at p. 3.  The defendants unilaterally seek to narrow "the prosecution theory" regarding the charged transactions as being "that the Defendants, by their *inaction*, caused Xinhua Finance to *fail to disclose* information concerning the transaction."  *Id.* at p. 4.  The Indictment, however, alleged that the defendants' actions in certain charged transactions "caused Xinhua Finance to furnish statements to the SEC that misrepresented and failed to disclose," among other things, related party transactions and the number of shares

The Supreme Court held that, because the prosecution did not object to the instruction, "it is unnecessary for us to decide whether that instruction erroneously read a culpability requirement into the jurisdictional phrase. . . .  The jury's finding that federal agency jurisdiction was reasonably foreseeable by the defendant, combined with the requirement that the defendant had actual knowledge of the falsity of those statements, precludes the possibility that criminal penalties were imposed on the basis of innocent conduct." *Id.*

owned directly and beneficially by Bush and Pelino.[18]   Thus, the affirmative misrepresentations alleged in Counts Six through Nine are actionable regardless of a duty to disclose.  *See Kowal v. MCI Commc'n Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) ("if the company chooses to volunteer such information, its disclosure must be full and fair, and courts may conclude that the company was obliged 'to disclose additional material facts . . . to the extent that the volunteered disclosure was misleading.'") (quoting *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 641 n.17 (3d Cir. 1989)).

But even assuming *arguendo* that the alleged false statements were entirely based on omissions, which is not the case, Xinhua Finance had a duty to disclose to the SEC such information to allow Xinhua Finance to offer its ADRs for sale in the United States.  The information "required" to be furnished for the exemption included "information material to an investment decision."  17 C.F.R. § 240.12g3-2(b)(3) (2007).  Such information material to an investment decision specifically included, among other things, "the financial condition or results of operations," "the granting of options or the payment of other remuneration to directors or officers," and "transactions with directors, officers or principal security holders."  *Id.*  As a result, the defendants may be held liable under Section 1001 for their acts that caused Xinhua Finance to omit information in the reports furnished by the Company to the SEC.  *See Crop Growers Corp.*, 954 F. Supp. at 348 n.14 ("Where a defendant with no duty to disclose particular information knowingly and willingly keeps a third

---

[18]        *See* Indictment ¶¶ 36, 48, 57, 61.b (Singhal "misrepresented and concealed" information); 61.g. (defendants caused Xinhua Finance to furnish statements that "misrepresented and omitted related party transactions"), 61.h (defendants caused Xinhua Finance to furnish statements that "misrepresented the number of shares owned directly and beneficially" by Bush and Pelino), 62.bbb-hhh (defendants caused Xinhua Finance to furnish reports that "provided false and misleading information" concerning the number of Xinhua Finance shares owned directly and beneficially by Bush and Pelino).

party from making a required disclosure, the defendant is liable under 18 U.S.C. § 2(b), even though

he lacks the scienter requisite for a primary violation.").[19]

## VI.    Counts Six through Nine Should Not be Dismissed for Lack of Materiality. [Opp. to ECF Doc. 47-1]

The defendants have moved to dismiss Counts Six through Nine of the Indictment for lack

of materiality.  *See* ECF Doc. 47-1.  Here, as in the defendants' other motions to dismiss, *see* ECF

Doc. 40-1, 41-1, and 46-1, they contend that because "the SEC could not have regulated Xinhua

Finance based on statements regarding related party transactions or the ownership of securities by

insiders, any false statements regarding those issues could not be material as a matter of law."  ECF

Doc. 47-1 at p. 6.  As discussed above, the SEC had the power to regulate the statements furnished

by Xinhua Finance, specifically concerning such material information as related party transactions

and insider trading, pursuant to Rule 12g3-2b(3), *see* 17 C.F.R. § 240.12g3-2(b)(3),[20] and Section

10(b) of the Exchange Act and Rule 10b-5 thereunder.[21]  Thus, defendants' arguments are meritless.

---

[19]    In addition, the Indictment alleged, pursuant to the terms of Xinhua Finance's insider trading policy, the following concerning the need for officers and directors to report the sale of their shares: "Under Japanese securities laws, members of the Board of Directors of the Company are required to report to the Tokyo Stock Exchange on any trades in shares of the Company from time to time.  These reports must be accurately filed by the fifteenth calendar day in the month following the trade."  Indictment ¶ 37.

[20]    The defendants' contention that currently "a foreign issuer need only post copies of the same filings [made with a foreign exchange] on its website, as opposed to submitting them directly to the SEC," *see* ECF Doc. 47-1 at p. 6 (citing 17 C.F.R. § 240.12g3-2(e)), ignores the separate and continuing mandate that such electronic copies include "information that is material to an investment decision regarding the subject securities," including information on related party transactions.  *See* 17 C.F.R. § 240.12g3-2(b)(3)(i)(G) (2011).

[21]    The defendants' assertion that "as a matter of law, the SEC had no authority to make *any* decision or take any action on the statements in Xinhua Finance's reports," *see* ECF Doc. 47-1 at p. 9, ignores the SEC's authority to terminate Xinhua Finance's exemption from registration under Rule 12g3-2(b) or to bring an action under Rule 10b-5 for fraud in connection

## VII.    The Indictment is Not Unconstitutionally Vague. [Opp. to ECF Doc. 42-1 and 45-1]

### A.    Background and Legal Principles

"The Due Process Clause of the Fifth Amendment prohibits punishing a criminal defendant for conduct which he could not reasonably understand to be proscribed.  The Supreme Court has held that this 'fair warning' requirement prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendants' actions were criminal." *United States v. Kanchanalak*, 192 F.3d 1037, 1046 (D.C. Cir. 1999) (internal quotation, citation omitted).  "[T]he vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Lanier*, 520 U.S. 259, 266 (1997) (internal quotation, citation omitted); *see also Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited"); *Hutchins v. District of Columbia*, 188 F.3d 531, 546 (D.C. Cir. 1999) ("a statutory provision is sufficiently definite to satisfy due process requirements so long as a person of ordinary intelligence would have a reasonable opportunity to know what is prohibited").

### B.    Analysis

#### 1.    The offenses here are governed by United States law.

The Indictment alleges that Xinhua Finance sought to offer and sell ADRs on the United States over-the-counter market, and that in doing so, it was required to furnish certain information to the SEC as part of "establish[ing] an exemption from registration" for such activity.  Indictment ¶¶ 3, 24, 61.u.  As described above, establishing such an exemption imposed a variety of legal duties

_____

with the purchase and sale of Xinhua Finance's ADRs to U.S. investors.

on Xinhua Finance.  Specifically, in addition to Xinhua Finance's obligation to furnish reports under

Rule 12g3-2(b), see 17 C.F.R. §§  12g3-2(b)(1)(i) and (iii), the exemption Xinhua Finance used

"required" it to furnish to the SEC "information material to an investment decision," which

specifically included "remuneration to directors or officers" and "transactions with directors, officers

or principal security holders."  *Id.*, Rule 12g3-2(b)(3).   In addition, the reports Xinhua Finance

furnished to the SEC were subject to the SEC's jurisdiction under Section 10(b) of the Exchange

Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, which prohibit, *inter*

*alia*, the use of schemes to defraud, untrue statements, material omissions, and any acts that would

operate as a fraud or deceit upon anyone.

As alleged in the Indictment, the charged offenses (Counts Two through Nine, Sections 1341

and 1001) are violations of United States criminal law.  These offenses concern materials Xinhua

Finance furnished to the SEC which violated requirements for those materials under United States

law.  Thus, these offenses do not stem from, or depend upon, foreign law.  Defendants' attempts to

argue otherwise are simply without basis in the Indictment, or in the law.[22]  Defendants contend that

---

[22]      Defendants' repeated incantation that certain reports were initially prepared for
other countries' regulators misses the point; the defendants are not charged here for filings in
foreign countries.  Rather, they are charged with what they caused to be furnished to the SEC.
To summarize, once the defendants chose to avail themselves of the American capital markets,
Indictment ¶¶ 3, 61.u, chose to offer some 20,000,000 ADRs on the over-the-counter market, *see*
*supra* at n.6, and chose to establish and maintain an exemption from registration with the SEC,
*id.* ¶ 24, the defendants subjected their actions to United States law.  *See* 17 C.F.R. §§ 12g3-
2(b)(1), (3); 15 U.S.C. § 78j(b); and 17 C.F.R. § 240.10b-5.

For these same reasons, defendants' claim that the Indictment "fails to . . . identify what
foreign law mandated Xinhua Finance" to disclose the related-party transactions and shares sales
(ECF Doc. 42-1 at 2) is beside the point.  Regardless of whether defendants also violated foreign
securities laws (which may be relevant as an evidentiary matter), they are charged here not with
violating those laws, but with violating United States criminal law by causing Xinhua Finance to
mail to the SEC statements which contained falsifications and material omissions.

they had no duties under U.S. law related to the materials mailed to the SEC (ECF Doc. 42-1 at 2, 8, 11); *see, e.g., id.* at 13 ("At no time . . . was Xinhua Finance required to conform its reports to U.S. securities laws requirements."). However, as set forth above, this is contrary to the plain terms of Rule 12g3-2(b), Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. In blithely asserting that "United States law does not provide the [d]efendants with any notice as to what the Xinhua Finance reports had to contain" (ECF Doc. 45-1 at 4), defendants ignore not just the general proscriptions of the mail fraud and false statement statutes, but also the law set forth above which further explains the requirements for Xinhua Finance's reports.

Likewise, without supporting legal authority, defendants claim that "the Indictment confirms that Xinhua Finance was required *only* to furnish translations of material it already had filed in foreign jurisdictions" (ECF Doc. 45-1 at 4) (emphasis added); see also ECF Doc. 42-1 at 4 (same).[23]

---

Nor are defendants' purported claims of confusion about the law governing their submissions to the SEC tenable. In ECF Doc. 42-1 (at 2), defendants argue that "Xinhua Finance's only requirement under U.S. law was to 'furnish' English-language copies of its foreign securities filings to the SEC," but they ultimately acknowledge (at 13) that Xinhua Finance conducted business in the United States and had obligations to furnish information to the SEC when it sought an exemption from registration in order to sell ADRs in the United States. After finally recognizing such actions in the United States, defendants (as they must) also concede that Rule 12g applies (*id.* at 13, citing 17 C.F.R. § 240.12g3-2). But defendants (*id.* at 13-14) discuss only part (b)(1) of the rule, ignoring the part (b)(3), the portion described above. Of course, the governing regulations (in (b)(3) and elsewhere) are no less applicable simply because defendants are reluctant to acknowledge Xinhua Finance's decision to offer ADRs in the United States, or refuse to mention them.

[23]    The only authority defendants appear to cite in either motion, beyond generalized legislative history, is a footnote in a 2010 SEC request for comment (ECF Doc. 42-1 at 14-15) (citing SEC Release No. 34-63547, 2010 SEC LEXIS 4435, at *26 n.50, inaccurately described by defendants as a "no-action letter"). In the course of soliciting comments on whether to require submissions from issuers exempt under Rule 12g3-2(b) under a conflict minerals rule, the request for comment observed that, in general terms, Rule 12g3-2(b)-exempt issuers made furnishings not filings "because they were subject to their home country, and not Exchange Act, disclosure rules." *Id.* But an over-generalized footnote in a comment solicitation has no authority to

This mischaracterizes both the Indictment and the law.  Nowhere does the Indictment, at ¶ 24 or anywhere, indicate that Xinhua Finance was required "only"to furnish translations.  Nor could the Indictment accurately allege that, as it misstates the law.  At most, ¶ 24 describes part of Xinhua Finance's requirements under law, but nowhere purports to describe all Xinhua Finance's legal duties in furnishing such information.[24]  Defendants' repeated attempts to characterize this as their "only" obligation, while ignoring (for example) the balance of Rule 12g3-2 (particularly subpart (b)(3)), is critical: because simply re-filing the reports was not defendants' "only" obligation, their motions fail under this faulty premise.

> 2.      **Neither the mail fraud statute nor the false statements statute are unconstitutionally vague as applied to the facts alleged in the Indictment.**

The mail fraud statute is not unconstitutionally vague as applied to a continuing fraudulent scheme advanced in the United States through mailings which contain material misrepresentations and omissions.  As alleged in the Indictment, defendants were engaged in a scheme to defraud and to obtain money from Xinhua Finance by engaging in and concealing various related-party transactions and sales of shares.  When Xinhua Finance sought to access American capital markets, which required the mailing of various materials to the SEC, and which materials misrepresented and concealed the activity, "[a] person of ordinary intelligence would reasonably understand that those actions were proscribed by a statute that criminalizes the use of the mails and wires to perpetrate a fraud."  *United States v. Williams*, 441 F.3d 716, 724-25 (9th Cir. 2006).  In short, just as any

---

rewrite the express terms of 17 C.F.R. §§ 12g3-2(b)(1), (3); 15 U.S.C. § 78j(b); or 17 C.F.R. § 240.10b, and defendants make no credible claim to the contrary.

[24]      For the same reasons, contrary to the defendants' claim, the Indictment nowhere "concedes" that "Xinhua Finance was neither required, nor expected, to make filings in conformance with U.S. law" (ECF Doc. 42-1 at 8).

domestic corporation offering securities for sale is governed by the relevant law and regulations, and subject to mail fraud for actions related to that sale, so too are foreign entities which choose to offer securities for sale in the United States.  Analogously, in *United States v. Harris*, 185 F.3d 999 (9th Cir. 1999), the court rejected vagueness challenges in a case involving mail fraud and false statements on ERISA documents, observing that the ERISA "statute . . . was not unconstitutionally vague, because, as applied to [defendant], it was clear what he should do: truthfully fill out the ERISA form."  *Id.* at 1004.  As in *Harris*, Xinhua Finance's obligations in its submissions to the SEC was clear: it was "not to lie on the forms, and to disclose what the [law and regulations] told [it] to disclose." *Id.*[25]

Defendants fail to explain why this straightforward application of the mail fraud statute to the "material misrepresentations and omissions" in Xinhua Finance's mailings to the SEC is insufficient, particularly given the further obligations imposed specifically in the rules and statutes governing such reports.  At best, in one motion, they argue (ECF Doc. 45-1 at 5) that they have found no cases applying the mail fraud statute in the precise context of this case.  But the Supreme Court has rejected attempts to require that offenses be "fundamentally similar" to precedent, noting that convictions are upheld "despite notable factual distinctions between the precedents relied on and

---

[25]      Defendants claim that the Indictment does not "allege that the [d]efendants executed a fraudulent scheme by violating a known legal duty imposed under United States law" (ECF Doc. 45-1).  Defendants do not explain how this undermines the mail fraud counts.  Although the law imposes relevant legal duties on Xinhua Finance, 17 C.F.R. §§  12g3-2(b)(1), (3); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5, the government need not have alleged such a duty, or a violation of a duty, in the Indictment for the simple reason that it is not an element of either the mail fraud or false statements counts.  *See, e.g.*, *United States v. Innamorati*, 996 F.2d 456, 477 (1st Cir. 1993) ("[t]he government need not recite all of its evidence in the indictment"); *United States v. Ellender*, 947 F.2d 748, 755 (5th Cir. 1991) (same).

the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Lanier*, 520 U.S. at 270.

In the other motion, defendants argue that the Indictment violates Rule 7(c) because it fails to cite the "provision of law that the defendant is alleged to have violated" (ECF Doc. 42-1 at 9); and they argue that the Indictment must "identify theory of law under which the reports at issue are to be judged" (ECF Doc. 42-1 at 8). By this, defendants seem to mean that the Indictment must do more than identify how the reports contain "material misrepresentations and omissions" in furtherance of the scheme (for the mail fraud counts) or falsified or concealed material facts (for the false statements counts) – specifically, that the Indictment must allege some *additional* applicable law governing the mailings to the SEC in order "to provide adequate notice of the charges to [d]efendants" (ECF Doc. 42-1 at 10). But defendants cite no authority that requires an Indictment to allege facts beyond the elements of the charged offenses, and there is none. For whether the defendants *also* violated more specific duties under relevant United States securities laws (such as 17 C.F.R. §§ 12g3-2(b)(1), (3); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5), such violations are not required to prove mail fraud or false statements. In an analogous context, the Second Circuit has noted that the government need not prove violations of GAAP to establish securities fraud violations in cases based on accounting malfeasance: "Defendants wisely do not argue that the prosecution was required to prove that they violated GAAP to establish that they committed securities fraud. It has been the long-held view in this Circuit that GAAP neither establishes nor shields guilt in a securities fraud case. . . .[C]ompliance with GAAP is relevant only as evidence of whether a defendant acted in good faith." *United States v. Rigas*, 490 F.3d 208, 220 (2d Cir. 2007) (citation omitted); *see also*

*id.* at 222 ("a violation of GAAP is not an element of the [securities fraud] offenses charged").  Other

cases reach the same conclusion.[26]

For the same reasons, the false statements statute is not unconstitutionally vague as applied

to a continuing fraudulent scheme advanced in the United States by furnishing materials to the SEC

which falsified and concealed material facts.  As set forth above, that falsification and concealment

of material facts occurred despite the duties imposed on Xinhua Finance under the securities law set

forth above.  Among other things, the exemption Xinhua used "required" it to furnish to the SEC

"information material to an investment decision," which specifically included "remuneration to

---

[26]       *See United States v. Ebbers*,  458 F.3d 110, 125 (2d Cir.2006) (compliance with
GAAP may have evidentiary relevance as to defendants' good faith, but is not an element the
government must prove); *see also id.* at 125-26 (issue in relation to allegedly false financial
reports is not whether an argument could be made that the accounting was permissible under
particularized rules, but whether the use of the accounting rules led to a financial statement that
was materially misleading); *SEC v. Seghers*, 298 Fed. Appx. 319, 331 (5th Cir. 2008) ("proof of
[defendant's] misrepresentations and omissions does not depend on compliance with GAAP, but
instead depends on evidence that [defendant's] statements and omissions were false or
misleading to investors"); *United States v. Hatfield*, 724 F.Supp.2d 321, 325 (E.D.N.Y. 2010)
(following *Rigas*); *United States v. Olis*, Criminal No. H-03-217-01, 2008 WL 5046342, at *20
(S.D. Tex. Nov. 21, 2008) ("The scheme to defraud alleged and proved in this case did not turn
on whether the . . . [company's] financial statements technically complied with GAAP or
whether [defendants] intended to violate GAAP but, instead, on whether the defendants'
disclosures about [the company/scheme] intentionally omitted material facts that caused [the
company's] financial statements to be materially false and misleading.").  *United States v. Lake*,
472 F.3d 1247 (10th Cir. 2007), cited by defendants (ECF Doc. 42-1 at 16) is easily distinguished
as set forth in *Rigas*, 490 F.3d at 222.

Other of defendants' citations, if anything, contradict their claim that the Indictment need
include additional allegations beyond the elements of the charged offense.  *See, e.g.*, *United
States v. Giampa*, Case No. S-92–Cr. 437, 1992 WL 322028, at *2-*3 (rejecting Rule 7 challenge
for failure to set forth underlying state offenses in federal RICO indictment, noting lack of
prejudice; "[i]t is the underlying unlawful activity, rather than the citation to the section itself,
which constitutes the essential element of the crime charged"); *United States v. Garrison*, 348 F.
Supp. 1112, 1121-22 (E.D. La. 1972) (indictment need not describe the related state law intended
to be violated but only "identify the type of unlawful activity" defendants engaged in).

directors or officers" and "transactions with directors, officers or principal security holders." 17 C.F.R. §§ 12g3-2(b)(3); *see also* 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 (prohibiting, *inter alia*, the use of schemes to defraud, untrue statements, material omissions, and any acts which would operate as a fraud or deceit upon anyone).

Given this governing law, defendants' argument that "[t]he requisite clarity is lacking where rules or regulations allegedly requiring disclosure of information . . . are ambiguous as to whether disclosure is required" must fail (ECF Doc. 45-1 at 6-7). *Crop Growers Corp.*, 954 F. Supp. at 45, is distinguishable on its facts; there, unlike here, there was "no duty whatever to disclose information." A more apt comparison is *Kanchanalak*, which rejected a vagueness challenge in the context of misleading statements about the source of funds on reports to the Federal Election Commission. 192 F.3d at 1046. Analogously to this case, "defendants should reasonably have understood federal laws to require committees to report the true source of soft money donations" and "that disguising those true sources would cause false statements to be made in violation of 18 U.S.C. §§ 2(b), 1001." *Id.* By concealing their fraudulent related-party transactions and sales of shares from Xinhua Finance, the defendants knowingly caused submissions to the SEC which falsified and concealed material facts. Any argument that it was not "reasonably clear" to defendants that such actions were illegal under the false statements statute is frivolous.

### 3. There is no basis here for compelling the government to produce any transcripts showing the grand jury's legal charge.

#### a. Background and Legal Principles

Rule 6(e) of the Federal Rules of Criminal Procedure permits the disclosure of grand jury materials in narrow circumstances. However, the "indispensable secrecy of grand jury proceedings

. . . must not be broken except where there is a compelling necessity." *United States v. Proctor &*

*Gamble*, 356 U.S. 677, 682 (1958).  The standard is high:

> [t]he prerequisites for disclosure of grand jury materials are demanding. Specifically, a party seeking grand jury materials must show (1) the materials are needed to avoid a possible injustice in another judicial proceeding, (2) the need for disclosure is greater than the need for continued secrecy, and (3) the request is structured to cover only material so needed.  Relevance alone is not sufficient; secrecy will not be broken absent a compelling necessity for the materials.  Further, the request must amount to more than a request for authorization to engage in a fishing expedition.

*United States v. Riley*, 292 Fed. Appx. 717, 722 (10th Cir. 2008).

Courts reject such requests where they "appear[] to be based on mere speculation, failing to

show a compelling or particularized need for production of the transcript." *Riley*, 292 Fed. Appx.

at 722; *see also United States v. Canino*, 949 F.2d 928, 943 (7th Cir. 1991) (rejecting request for

legal instruction to grand jury; "[m]ere unsupported speculation of possible prosecutorial abuse does

not meet the particularized need standard"); *United States v. Tamrez*, 951 F.2d 364, 1991 WL

275352 at *1 (9th Cir. Dec. 20, 1991) (rejecting "speculative assertions" that "the prosecutor must

have . . . given the grand jury erroneous advice").  Further, such speculation cannot "overcome the

presumption of regularity accorded to grand jury proceedings, or demonstrate the 'compelling

necessity' necessary to require disclosure of grand jury proceedings." *United States v. Lisinski*, 728

F.2d 887, 894 (7th Cir. 1984); *United States v. Recognition Equip., Inc.*, 711 F. Supp. 1, 11 (D.D.C.

1989) (there is a "presumption of regularity in grand jury proceedings"), overruled on other grounds

as recognized in *Moore v. Hartman*, Civ. A. Nos. 92–2288 and 93–0324, 1993 WL 405785 at *8

(D.D.C. Sept. 24, 1993).

In addition, courts have held that a "facially valid indictment undermines any 'particularized

need' . . . for disclosure of the grand jury transcript," including the instructions. *United States v.*

*Espy*, 23 F.Supp.2d 1, 10 (D.D.C. 1998); *see also United States v. Trie*, 23 F. Supp. 2d 55, 62 (D.D.C. 1998) (where "the indictment is facially valid and [defendant's] claim . . . does not justify dismissal of the indictment, [defendant] has not established any particularized need for the grand jury instructions"); *see also id.* ("the mere suspicion that the grand jury may not have been properly instructed . . . is insufficient to establish that [defendant] is entitled either to . . . disclosure of grand jury materials").[27]

"The burden is on the defendant to show that disclosure of grand jury transcripts is appropriate." *United States v. Reed*, 156 F.3d 1241, 1998 WL 403360 at *5 (9th Cir. July 7, 1998) (citation omitted).

### b.    Analysis

In the alternative, defendants ask that the Court "order disclosure of the grand jury charge," on the basis that (defendants contend) "the Indictment appears to be based on interpretation of U.S. securities laws, which have no application to the crimes alleged" creating "a strong likelihood that the grand jury was improperly instructed" (ECF Doc. 42-1 at 11). But defendants identify no portion of the Indictment which misstates the law or the elements of the offense.[28] Indeed, the only portions of the Indictment that defendants claim describes what they term "U.S. securities laws" are ¶¶ 3 and

---

[27]    Thus, these cases reject defendants' claim that "a showing of particularlized need is unnecessary when requesting the instructions given to the grand jury" (ECF Doc. 42-1 at 12).

[28]    Defendants concede that "there is absolutely no indication that the grand jury ever considered foreign law" (ECF Doc. 42-1 at 16). This concession is fatal to any claim that there is "a strong likelihood that the grand jury was improperly instructed" (*id.* at 11) about foreign law. To prevail, defendants must show some "strong likelihood" that the grand jury was improperly instructed as to some other law. The only such error they claim is as to "U.S. securities laws."

24, which defendants do not dispute accurately state certain of Xinhua Finance's obligations pursuant to their exemption from registration.

Unable to identify any portion *within* the Indictment suggesting any charge to the grand jury was legally erroneous, the defendants turn to speculation about what is *not* stated in the Indictment, wondering "what the grand jury was told about 'what is required to be reported'" (ECF Doc. 42-1 at 16). But this is the very type of speculation that cannot overcome the presumption of regularity of grand jury proceedings, or meet defendants' burden to show a particularized need for disclosure. Indeed, the fact that the Indictment is facially valid and sets forth all the requisite elements of the mail fraud and false statement offenses rebuts defendants' suggestion that somehow the grand jury considered or made findings based on other elements or sources of law not set forth in the grand jury's Indictment. *See Espy*, 23 F.Supp.2d at 10; *Trie*, 23 F. Supp. 2d at 62.[29, 30]

---

[29]    Defendants claim (ECF Doc. 42-1 at 18-19) that grand jury testimony describing Xinhua Finance's mailings to the SEC which used the lay terminology "files" and "filing" (rather than the technical term "furnish"), constituted a "knowing use of false testimony" is frivolous. As discussed above, Xinhua Finance made filings, such as a SEC Form F-6, as a pre-condition to offering its ADRs to U.S. investors. Although the referenced grand jury testimony of one witness used the word "filing," rather than "furnishing," there is no indication that any such terminological distinction had any relevance to the Indictment, particularly the language in the charged offenses. Further, none of the charged offenses make a distinction between whether the materials mailed to the SEC were "filed" or "furnished." Thus, defendants' criticisms of the use of lay terminology do nothing to establish a particularized need to review the grand jury charge.

[30]    Defendants also complain that the government has refused to explain the law to them, claiming that the government has not "identif[ied] *any* basis, whether U.S. or foreign, for the obligation of Xinhua Finance to disclose information concerning 'related party' transactions, the number of . . . shares owned by officers and directors, and other such obligations" (ECF Doc. 42-1 at 17). Defendants cite no authority requiring the government to provide such legal explanations, nor is there any such obligation to, in essence, "explain the law" to defendants. *See United States v. Ramirez*, 54 F. Supp. 2d 25, 29 (D.D.C. 1999) ("A bill of particulars is not a discovery tool or a devise for allowing the defense to preview the government's theories or evidence.").

**VIII.   Counts Two through Five Sufficiently Allege Mail Fraud. [Opp. to ECF Doc. 43-1]**

    **A.      The Indictment sufficiently informs defendants of the mail fraud charges.**

        **1.      Background and Legal Principles**

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment provide "a plain, concise and definite written statement of the essential facts constituting the offense charged." In addition, "[a]n indictment meets the guarantees of the Fifth and Sixth Amendments 'if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Wicks*, 187 F.3d 426, 427 (4th Cir. 1999) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). "Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling*, 418 U.S. at 117-18 (quotation, citation omitted); *Russell v. United States*, 369 U.S. 749, 765 (1962); *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002) (same).

        **2.      Analysis**

            **a.      Paragraph 64, Parts (a) and (b)**

Defendants argue that the mail fraud counts as alleged are ambiguous and fail to apprise them of the scheme to defraud, "leaving them with no ability to prepare properly for trial." (ECF Doc. 43-1 at 7, 10).[31] These claims are meritless. The defendants' arguments focus almost exclusively on

---

[31]      Defendants do not claim that the Indictment will prevent them from asserting a double jeopardy bar. Moreover, any such claim would be meritless. *See United States v. Haldeman*, 559 F.2d 31, 126 (D.C. Cir.1976) (standard to assess double jeopardy challenges).

claimed defects in ¶ 64 of the Indictment, ignoring the earlier paragraphs explaining the scheme. With respect to parts (a) and (b), the defendants contend that a typographical error or minor omission renders the mail fraud counts ambiguous and not "grammatical" (*Id.* at 7). Specifically, defendants note the successive infinitives in "(a) to obtain things of value from Xinhua Finance to misrepresent and avoid disclosing [related party] transactions" and "(b) to sell Xinhua Finance shares to misrepresent and avoid disclosing the sale of shares" (ECF Doc. 43-1 at 7-8).

Such typographical or grammatical mistakes do not render the Indictment insufficient. The constitutional test is not whether an indictment is grammatically correct, but whether it "fairly informs a defendant of the charge against which he must defend." *Hamling*, 418 U.S. at 117; *see also Russell*, 369 U.S. at 763 ("Convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused.") (quotation, citation omitted). Rather, "[c]harging documents are tested by whether they apprise the defendant of what evidence he must be prepared to meet. . . . An indictment should be read in its entirety, construed according to common sense and interpreted to include facts which are necessarily implied." *United States v. Phillips*, 869 F.2d 1361, 1364-65 (6th Cir. 1988) (quotation, citation omitted).[32] "An indictment is to be read in light of its purpose, which is to inform the accused of the charges." *Id.* at 1365 (quotation, citation omitted); *United States v. Mouton*, 657 F.2d 736, 739 (5th Cir. 1981) (same). "The test is not whether the indictment could have been framed in a more satisfactory manner but whether it conforms to

---

[32]     *See also United States v. McGarrity*, --- F.3d ---, 2012 WL 370104, at *7 (11th Cir. Feb. 6, 2012) (courts "give the indictment a common sense construction, and its validity is to be determined by practical, not technical, considerations") (quoting *United States v. Poirier*, 321 F.3d 1024, 1029 (11th Cir. 2003)); *United States v. Gold*, 743 F.2d 800, 812 (11th Cir. 1984) (same); *United States v. Christopher*, 700 F.2d 1253, 1257 (9th Cir. 1983) (same).

minimal constitutional standards." *United States v. Olatunji*, 872 F.2d 1161, 1168 (3d Cir. 1989)

(internal quotation, citation omitted); *McGarrity*, 2012 WL 370104, at *7 (same).

In light of those principles, the Indictment is plainly sufficient. Despite the claimed defects,

the mail fraud scheme charged in Counts Two through Five remains the same scheme described

throughout the Indictment. Put simply, the defendants "engaged in a conspiracy and a scheme to

defraud the [SEC], investors and others and to enrich themselves through a series of undisclosed and

disguised related party transactions and insider trading that generated proceeds exceeding $50

million." Indictment ¶ 1. As part of this conspiracy, the defendants "devise[d] a scheme and artifice

to defraud, and to obtain money and property by means of materially false and fraudulent pretenses

[and] representations" and "for the purpose of executing such scheme . . . did knowingly cause to

be sent, delivered and moved by the United States Postal Service and private and commercial

interstate carriers reports and other filings of Xinhua Finance." *Id.* at ¶ 59a. The goal of the

conspiracy was for the defendants to "enrich themselves through a series of undisclosed and

disguised related party transactions and insider trading of Xinhua Finance shares." *Id.* at ¶ 60. Read

in light of this straightforward explanation of the conspiracy and its goals and means, the defendants'

scheme to defraud and to obtain things of value referenced in ¶ 64 is easily understood – despite any

grammatical or typographical errors.

This description (particularly combined with the overt arts) sufficiently apprises defendants

of the charges. Rejecting a similar claim that a mail fraud indictment was "impermissibly vague,"

the Sixth Circuit noted that because the indictment at issue had a "clear and specific description of

the fraudulent scheme," it did "provide some 'substantial indication of the nature or character' of the

scheme involved." *United States v. Azad*, 809 F.2d 291, 295 (6th Cir. 1986) (internal quotation,

citation omitted); *see also United States v. Pollack*, 534 F.2d 964, 970 (D.C. Cir. 1976) (indictment sufficient where it "charged defendants with fraud in connection with obtaining stock . . . and selling the stock through a network of accounts to conceal their interest in the proceeds"; indictment also "listed various specific misrepresentations, promises, and concealments allegedly made by defendants as well as the dates and names of recipients of mail and wire use").

Even were the Court to have concerns about the grammatical errors, such concerns are easily addressed. The Court may appropriately construe Indictment ¶ 64 as follows:

> From in or around January 2004 through in or around January 2009, defendants . . . engaged in a scheme (a) to obtain things of value from Xinhua Finance [while] misrepresent[ing] and avoid[ing] disclosing transactions as related party transactions in reports furnished to the SEC and investors; (b) to sell Xinhua Finance shares [while] misrepresent[ing] and avoid[ing] disclosing the sale of shares in reports furnished to the SEC and investors; and (c) to manipulate Xinhua Finance's balance sheet to avoid potentially negative impairment charges.

Seeking to avoid any such remedy for the ambiguity they purport to identify, defendants contend that the Court cannot "interpret and effectively amend the Indictment's language" (ECF Doc. 43-1 at 9). Defendant's claim is contrary to long-settled law. "[T]he modern rule is that an indictment may be amended by the court, provided that the amendment is not substantial, it is sufficiently definite and certain, the accused is not taken by surprise, and any evidence the defendant had before the amendment would be equally available to him after the amendment." *United States v. Kegler*, 724 F.2d 190, 195 (D.C. Cir. 1984). Put another way, "the settled rule in federal courts prohibits substantive amendments, but permits changes in indictments that are merely 'a matter of form' or which correct insignificant clerical errors. An amendment of form and not of substance occurs when the defendant is not misled in any sense, is not subjected to any added burden and is not otherwise prejudiced." *Kegler*, 724 F.2d at 194 (quotation, citations omitted); *see also United*

*States v. Bush*, 659 F.2d 163, 166-167 (D.C. Cir. 1981) (amendments to correct such things as minor

clerical errors, misnomers, and dates "have usually been upheld because . . . the substance of the

charge was left totally unaffected, and the prerogative of the grand jury was not usurped one whit")

(quotations, citations omitted).[33]  Examples abound.  *See, e.g.*, *Kegler*, 724 F.2d at 194-95.[34]

### b. Paragraph 64, Part (c)

Part (c) of ¶ 64 references the part of the charged scheme to defraud and obtain money or

property by "manipulat[ing] Xinhua Finance's balance sheet to avoid potentially negative

impairment charges."  Earlier, the Indictment described this part of the scheme: After Xinhua

---

[33] Numerous Courts of Appeal agree.  *See, e.g., United States v. Dowdell*, 595 F.3d 50, 67-68 (1st Cir. 2010) ("prohibition [on substantive amendments] does not extend to alterations that are merely a matter of form"; allowing "ministerial corrections of clerical errors in names, dates, and citations, so long as the change would not deprive the defendant of notice of the charges against him") (quotations, citations omitted); *United States v. Pigee*, 197 F.3d 879, 886 (7th Cir. 1999) (no error in changes that "involve the correction of mere technical errors contained in the indictment, of a typographical or clerical nature, for example, which would not alter the essential substance of the charged offense") (quotation, citation omitted); *United States v. Bereano*, 161 F.3d 3, 1998 WL 553445 at *10 (4th Cir. 1998) ("[T]here is no amendment when the change is 'merely a matter of form,' such as a correction for a typographical or clerical error or a misnomer, a formal change to the date specified in the indictment within limits, or an inconsistency amounting to a simple matter of semantics."); *United States v. Miller*, 116 F.3d 641, 669-71 (2d Cir. 1997) (no error in adding defendant's name to count where it was inadvertently omitted); *United States. v. Cook*, 745 F.2d 1311, 1316 (10th Cir. 1984) ("An amendment of form and not of substance occurs when the defendant is not misled in any sense, is not subjected to any added burdens, and is not otherwise prejudiced.") (citation omitted).

[34] For example, in *Dowdell*, the "amendment of the indictment from distribution of 'cocaine' to 'cocaine base' did not affect the substance of the charges and therefore did not offend the Presentment Clause."  585 F.3d at 69.  The *Pigee* court "view[ed] the fact that the trial court earlier referred to a 'place' instead of a 'residence' and added 'manufacturing' to using and distributing in an earlier reference as benign supplemental verbiage." *Pigee*, 197 F.3d 879, 886 (7th Cir. 1999).  And in *United States v. Smith*, the court could correct indictments where they "switched either the towns or dates involved" in narcotics distribution counts because the error did not mislead defendant or deprive him of "an opportunity to adequately prepare a defense." 993 F.2d 1550, 1993 WL 186084 at *3-*4 (7th Cir. 1993).

Finance's receipt of "securities assets" from one of the defendants' disguised related party transactions with Wire Mill Partners II and Wiremill, "[t]o minimize the potential impact to Xinhua Finance's balance sheet posed by those securities assets . . . declining in value, Xinhua Finance sold certain of the assets to Hyperion." *Id.* at ¶ 56. Statements furnished to the SEC (*i.e.*, the charged mailings) misrepresented and failed to disclose the underlying related party transaction. *Id*. at ¶ 57. In this transaction, the defendants "used nominee entities to transfer assets off of Xinhua Finance's balance sheet to minimize potentially negative impacts to the balance sheet of Xinhua Finance." *Id.* at ¶ 61.f. In light of this, defendants' claim that "[t]here are no factual allegations in the Indictment that explain the meaning of this part of the alleged scheme" (ECF Doc. 43-1 at 8) fails; indeed, defendants even note ¶ 56 in their motion (*id.* at 8 n.5).

To the extent defendants' argument is based on their claimed failure to understand that "to avoid potentially negative impairment charges" in ¶ 64 relates to the descriptions of transfers "[t]o minimize the potential impact to Xinhua Finance's balance sheet posed by those securities assets . . . declining in value," *id.* at ¶ 56 and "transfer[s of] assets off of Xinhua Finance's balance sheet to minimize potentially negative impacts to the balance sheet of Xinhua Finance," *id.* at ¶ 61.f, this claim is frivolous: the government need not use identical language in each related paragraph of the Indictment. Defendants' other claims (ECF Doc. 43-1 at 8) are similarly feckless. The victims of this part of the scheme remain the same victims of the scheme as a whole: Xinhua Finance and investors as described in ¶¶ 1 and 64. Nor can defendants credibly claim (*id.* at 8) to misunderstand the nature of the manipulation: as alleged in ¶¶ 56-57, 61.f, and 64, the manipulation resulted from transferring securities assets to nominee entities to keep them off Xinhua Finance's balance sheets.

**B.      The mail fraud counts sufficiently allege a scheme to defraud, or for obtaining money and property.**

      **1.      Background and Legal Principles**

The mail fraud statute makes a criminal offense to devise or intend to devise "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. With respect to this element, the government must prove that the defendant knowingly devised or intended to devise any scheme or artifice to defraud the victim of money or property, or the defendant knowingly devised or intended to devise any scheme for obtaining money or property by means of material, false, or fraudulent representations, pretenses, or promises. *See United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 851-52 (D.D.C. 2006).

An indictment is not required to allege actual monetary loss. "It is only necessary to establish a scheme to defraud, and a mailing in furtherance thereof; it is not necessary even to show that a loss took place." *United States v. Reid*, 533 F.2d 1255, 1261 (D.C. Cir. 1976); *see also id.* at 1264 ("It is the scheme to defraud and not actual fraud that is required.").[35]

---

[35]      The Court of Appeals has squarely rejected claims to the contrary: "The fraud statutes speak alternatively of devising or intending to devise a scheme to defraud and do not require that the deception bear fruit for the wrongdoer or cause injury to the intended victim as a prerequisite to successful prosecution. Since success of the scheme and loss by a defrauded person are not essential elements of the crime under 18 U.S.C. §§ 1341, 1343, allegations of such consequences are unnecessary to a proper indictment." *Pollack*, 534 F.2d at 971; *see also United States v. Coachman*, 727 F.2d 1293, 1302-03 n. 43 (D.C. Cir. 1984) ("No particular type of victim is required . . . nor need the scheme have succeeded."); *Reid*, 533 F.2d at 1261. Other courts have rejected similar claims. *See United States v. Barber*, 881 F.2d 345, 348-49 (7th Cir. 1989) ("[I]t is not necessary that an indictment charging mail fraud contain such an allegation [of monetary loss]. . . . [I]t is sufficient that the indictment alleged a fraudulent scheme that had the potential, had it been successful, to have an economic impact on its victims. . . . [T]he mail fraud statute punishes schemes that have a substantial potential to take other people's property by fraud. It is not necessary that the intended victim actually have been defrauded."). Nor does

51

Moreover, victims of the fraud need not be identified in the indictment. *See United States v. Mizyed*, 927 F.2d 979, 981 (7th Cir. 1991) (rejecting claim that an indictment was "insufficient because it does not identify the victims of the mail fraud"); *see also United States v. Loayza*, 107 F.3d 257, 260-61 (4th Cir. 1997) (same); *United States v. Ruedlinger*, 990 F.Supp. 1295, 1297 (D. Kan. 2007) ("The law is well-settled that an indictment charging mail fraud . . . is sufficient even if it does not identify a specific victim. The identity of the fraud victims is not an essential element of the crime of mail fraud.") (citations omitted); *United States v. Zandstra*, 2000 WL 1368050, at *4 (S.D.N.Y. Sept. 20, 2000) (same).  This is because "[t]he crime of mail fraud does not include an element requiring a contemplated harm to a specific, identifiable victim." *United States v. Munoz*, 430 F.3d 1357, 1369 (11th Cir. 2005) (quotation, citation omitted).[36]

## 2.    Analysis

The allegations in the Indictment are more than sufficient.  The Indictment alleges that the defendants "engaged in a conspiracy and a scheme to defraud the [SEC], investors and others and to enrich themselves through a series of undisclosed and disguised related party transactions and insider trading that generated proceeds exceeding $50 million." Indictment ¶ 1; that the defendants "devise[d] a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses [and] representations" and "for the purpose of executing such scheme

---

*McNally v. United States*, 483 U.S. 350 (1987), change this principle.  *See United States v. Ginsburg*, 909 F.2d 982, 988 n. 8 (7th Cir. 1990) ("*McNally* does not require that actual loss of money or property be alleged in the indictment.").

[36]    *Accord United States v. Arlen*, 947 F.2d 139, 145 (5th Cir.1991) (discussing a violation of 21 U.S.C. § 333) ("[t]he prosecution must prove beyond a reasonable doubt that a defendant intended to defraud or mislead someone, but the indictment need not specify the intended victim; the focus is on defendant's intent, not the victim's identity").

. . . did knowingly cause to be sent, delivered and moved by the United States Postal Service and private and commercial interstate carriers reports and other filings of Xinhua Finance." *Id.* ¶ 59.a; that the defendants sought to "enrich themselves through a series of undisclosed and disguised related party transactions and insider trading of Xinhua Finance shares." *Id.* at ¶ 60; *see also* ¶ 61.c (same); and that the scheme included taking actions "to obtain things of value from Xinhua Finance" and "to sell Xinhua Finance shares." *Id.* at ¶ 64.  Moreover, virtually the entirety of the Indictment describes instances in which the defendants successfully obtained things of value from Xinhua Finance and obtained money and property stemming from undisclosed related party transactions and the undisclosed sale of Xinhua Finance stock.[37]

Defendants' claims of insufficiency are without merit.  Defendants argue that the Indictment "fail[s] to allege that the supposed victims have suffered monetary or property loss" (ECF Doc. No. 43-1 at 10).  Subsequently, defendants argue (*id.* at 13) that "[a]s to the investors in Xinhua Finance, there are absolutely no allegations that anyone bought stock at inflated prices."  As explained above, such allegations of actual loss are not required. *See Pollack*, 534 F.2d at 971; *Reid*, 533 F.2d at 1261.  Moreover, the Indictment does allege that the defendants obtained things of value from Xinhua Finance (*e.g.*, through undisclosed related party transactions and payments to defendants) and money and/or property (*e.g.*, from the undisclosed sale of Xinhua Finance stock).

---

[37]     *See, e.g., id.* at ¶¶ 25-36 (payments to defendants from undisclosed related party transactions and undisclosed sale of Xinhua Finance stock related to Entree Capital transactions); ¶¶ 37-48 (payments to defendants from undisclosed related party transactions and undisclosed sale of Xinhua Finance stock related to Bedrock Securities and Bedford); and ¶¶ 49-57 (payments to defendants from undisclosed related party transactions between Xinhua Finance and Wire Mill Parters II and Wiremill).

Defendants also attempt to dispute whether the Indictment "alleges a purpose to obtain money or property" (ECF Doc. 43-1 at 13). Defendants focus their assessment on what they term the "three 'potential' victims' of different aspects of the scheme – Xinhua Finance, the SEC and investors" (*id.* at 10). But they acknowledge (*id.*), as they must, that ¶ 64 includes such an allegation (that the defendants sought to obtain things of value from Xinhua Finance). After making this concession, defendants ignore its consequences – just as they ignore the other relevant allegations - and argue only about the sufficiency of allegations about harm to victims *other than Xinhua Finance*. This concession is fatal to their claims, even on their own terms. *See also* ECF Doc. No. 43-1 at 22 (defendants concede that the scheme is "one to defraud Xinhua finance of money or property").

As to any additional victims besides Xinhua Finance, as noted above, a mail fraud indictment is not required to name or identify the specific victims.[38] Moreover, courts have held that even where victims are identified in the indictment, such identification is mere surplusage, such that a variance between victims alleged in the Indictment and the proof at trial is harmless.[39]

With respect to investors, defendants' claims fare no better. Defendants pretend ignorance of the nature of investors alleged – but the Indictment identifies them. After identifying the "scheme to defraud . . . ,[*inter alia*], investors" in ¶ 1, the Indictment further describes those "investors":

---

[38]    "It is sufficient that the government in this case proved that [the defendant] intended to defraud the scheme's victims, whomever they were, and such intent was established by examining the circumstances of the scheme itself, not by who was specifically named in the indictment." *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010).

[39]    *See United States v. Pritchard*, 86 Fed. Appx. 387, 389-90 (10th Cir. 2004) (wire fraud "does not require an identified victim as an element"; variance between victim named in indictment and that proved at trial is harmless); *United States v. Ingram*, 62 Fed. Appx. 32, 33 (3d Cir. 2003) (because "identity of the victim . . . is not an essential element of" wire fraud, the removal of victim names from the indictment is not a constructive amendment).

"Beginning in or around 2003, Xinhua Finance raised funds from United States investors" by filing notices with, and furnishing documents to, the SEC; likewise, "investors globally [could] invest in Xinhua Finance" through its listing on the Tokyo Stock Exchange. *Id.* at ¶ 3; *see also* ¶ 62.a (describing how ADR presented opportunities for U.S. investors). It is simple tautology that any investors, United States or international, who held Xinhua Finance shares (or acquired them during the period of the scheme) were – *as the owners of Xinhua Finance* – victims of the fraud scheme that obtained things of value from Xinhua Finance, as defendants concede is properly alleged.[40] Moreover, investors generally (*i.e.*, investing public) were potentially harmed by the Xinhua Finance statements that misrepresented and omitted the related party transactions as well as the number of shares owned by defendants.

With respect to "victims," then, the Indictment is not insufficient in any way. In rejecting a challenge to an indictment's sufficiency, the Fourth Circuit noted that the indictment was "sufficiently specific" where "[t]he time period, the scheme, the purported investment companies, the 'cover-up' of the diversion of funds, and the use of the mail to carry out the scheme are all alleged." *Loayza*, 107 F.3d at 261. By contrast, "[t]he identity of the fraud victims is not an essential element of the crime." *Id.*[41]

---

[40]     The Indictment also describes other aspects of the scheme whereby investors in Xinhua Finance were potentially harmed. *See id.* at ¶¶ 31, 34 (describing how acceleration of lock-up period for defendants' sale of shared disadvantaged similarly situated investors).

[41]     Although the Indictment recognizes the SEC as a victim of defendants' deception and one of the recipients of the false statements, the government will not proceed on any theory that the SEC is a "victim" of the mail fraud scheme in terms of being a property rights holder. However, any language in the Indictment referencing the SEC does not create any potential for prejudice to defendants (or risk of confusion to the jury). Because the elements of the offense do not require the jury to consider the identity of victims, the jury will never have to consider the SEC as a "victim" of the mail fraud scheme in terms of being a property rights holder.

### C.     The mail fraud counts sufficiently allege mailings in furtherance of the scheme.

### 1.     Background and Legal Principles

The "mailing" element of mail fraud requires that the government prove that "the defendant mailed any matter, or caused the mailing of any matter (or sent or caused to be sent by interstate wire transmission), for the purposes of furthering or executing such scheme or artifice." *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 851-52.   Interpreting this element, the Supreme Court has noted that "[t]he federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud." *United States v. Schmuck*, 489 U.S. 705, 710 (1989) (quoting *Kann v. United States*, 323 U.S. 88, 95 (1944)).   But "[i]t is not necessary that the scheme contemplate the use of the mails as an essential element." *Pereira v. United States*, 347 U.S. 1, 8 (1954); *Durland v. United States*, 161 U.S. 306, 313 (1896) (proof of specific intent to use the mails on the part of defendants need not be proven).   Rather, "[i]t is sufficient for the mailing to be 'incident to an essential part of the scheme,' . . . or 'a step in [the] plot.'" *Schmuck*, 489 U.S. at 710-11 (citations omitted); *cf. United States v. Mills*, 199 F.3d 184, 188 (5th Cir. 1999) (same standard for wire fraud; wire was "incident to an essential part of the scheme"). Thus, "a mail fraud conviction does not require the existence of a 'but-for' link between the mailing and the fraud, or its cover-up."   *United States v. Pimental*, 380 F.3d 575, 587 (1st Cir. 2004). Mailings are "'in furtherance' of the scheme" when "they contribute[] to its overall success." *Id.*

### 2.     Analysis

Defendants contend (ECF Doc. 43-1 at 21) that the mailings here "were not in furtherance of the alleged scheme to defraud," but "were merely incidental to any charged conduct and to any scheme to defraud."   Specifically, defendants argue (*id.* at 21-22) that the reports were mailed to the

SEC "after the alleged scheme had been accomplished" and "played no role in enabling the [d]efendants to acquire dominion over the money or property."  These contentions are meritless.

In *Schmuck*, as here, the Supreme Court examined an "ongoing fraudulent venture."  489 U.S. at 711.  Unlike cases involving single-instance frauds, there the mailings were an essential step in the "long-term success of the fraud," an odometer-reversal scheme in which the defendants sold numerous different cars under the same scheme.  *Id.* at 714; *see also id.* at 712-13 (distinguishing, among others, *Kann v. United States*, 323 U.S. 88 (1944), and *Parr v. United States*, 363 U.S. 370 (1960)).  *Schmuck* "held that where the interstate mailing is used to further and perpetuate a scheme involving a series of continual frauds, rather than a 'one shot' deception, so that the perpetrator is not indifferent to the fact of who discovers the scheme or bears the loss, the jurisdictional element is satisfied."  *Mills*, 199 F.3d at 189.  In *Schmuck*, as here, the mailings maintained defendant's "relationship of trust and goodwill with the [unwitting victims] upon whose unwitting cooperation [the] scheme depended."  *Id.* at 714.  In sum, the facts sufficiently establish a mailing incident to an essential part of the scheme where "the success of [the defendant']s venture depended upon his continued harmonious relations with, and good reputation among, [his unwitting victims], which in turn required the smooth flow" of business.  *Id.* at 711-12.  This is true notwithstanding that the "mailings may not have contributed directly to the duping of" any of the victims.  *Id.* at 712.

Numerous courts have applied *Schmuck*'s reasoning where the "fraudulent venture was not an isolated swindle but rather was an ongoing operation."  *United States v. Slevin*, 106 F.3d 1086, 109 (2d Cir. 1996).  In such contexts,

> There is no requirement that the mailings precede the fraud. *See*, *e.g.*,
> *Schmuck* . . .; *United States v. Sampson*, 371 U.S. 75, 79-80, 83 S. Ct. 173,
> 175-76, 9 L.Ed.2d 136 (1962).  Where the frauds are not isolated or unrelated
> swindles, postfraud mailing of invoices, checks, or receipts may further the

> scheme by, for example, lulling the victims into believing they received the services fraudulently promised, or by helping to keep the scheme in operation by preserving a needed business relationship between a fraud victim and the defendant.

*Id.* at 1089-90 (some citations omitted).  In *Pimental*, the First Circuit reversed the dismissal of mail fraud charges when the district court adopted the strict view of the "in furtherance of" requirement urged by defendants.  There, mailings from a third-party insurer sent to the defendants were held sufficient; such mailings "helped [defendant] maintain his ongoing fraudulent venture by ensuring that he continued to receive insurance coverage."  380 F.3d at 586-88.  In sum, mailings that "contribute[] to the prevention of the scheme's detection by making detection of the scheme less likely" are "sufficient to satisfy the 'in furtherance of' requirement of the mail fraud statute."  *Id.* at 588.  Even *United States v. Tarnapol*, 561 F.2d 466, 472 (3d Cir. 1997), cited by defendants (ECF Doc. 43-1 at 22) notes that a mail fraud scheme may "depend[] in some way" on mailings which "prevent[] . . . its detection."

Under this standard, it is plain that the mailings to the SEC were "in furtherance of" the scheme as an incident to an essential part of it.  The mailings helped defendants maintain their ongoing fraudulent scheme by avoiding detection by existing investor-owners of Xinhua Finance, ensuring that Xinhua Finance continued to receive funds from prospective investors, and that the defendants could sell shares of Xinhua Finance to prospective buyers.  The share value obviously would have been negatively impacted were investors to become aware of the undisclosed related party transactions, sale of shares by defendants, payments to defendants, and manipulation of Xinhua Finance's balance sheet through transferring assets to related party entities.  Indeed, the mailings in this case would specifically abet the ongoing scheme by permitting Xinhua Finance to raise funds

from U.S. investors and sell ADRs – which investors would then be defrauded through defendants'

ongoing scheme.  Indictment at ¶¶ 3, 24.[42]

Defendants also argue (ECF Doc. 43-1 at 21) that there is no allegation that the defendants

wrote or reviewed the reports furnished to the SEC.  This is meritless, as proving mail fraud does

not require that the defendants themselves made or directed the mailing, only that they "caused" the

mailing to be made.  Courts have repeatedly held it unnecessary to show that the defendant directly

participated in the transmission, where it is established that the defendant caused the transmission,

and that such use was the foreseeable result of his acts.  *See*, *e.g.*, *United States v. Bonansinga*, 773

F.2d 166, 168 (7th Cir. 1985) ("Where one does an act with knowledge that the use of the mails will

follow in the ordinary course of business, or when such use can reasonably be foreseen, even though

not actually intended, then he 'causes' the mails to be used.") (quoting *Pereira v. United States*, 347

U.S. 1, 8-9 (1954)); *United States v. Weiss*, 630 F.3d 1263, 1272 (10th Cir. 2010) (same; wire fraud)

(collecting cases); *United States v. Bortnovsky*, 879 F.2d 30, 38 (2d Cir. 1989) (even if defendants

may not have anticipated specific mailing by third party, they could reasonably foresee use of mails

to monitor their fraudulent claim) (collecting cases); *see also Bonansinga*, 773 F.2d at 168

---

[42]     To the extent defendants' motion can be construed to complain about the lack of
specific allegations about how the mailings were "in furtherance of" the scheme, this raises no
concerns.  "The Government need not allege the subordinate evidentiary facts by which it intends
to prove the 'in furtherance' element of the crime charged, and an indictment setting out the
mailings charged and alleging that they were in furtherance of the scheme should not be
dismissed as insufficient on its face unless there is no conceivable evidence that the Government
could produce at trial to substantiate its 'in furtherance' allegation."  *United States v. Castor*, 558
F.2d 379, 385 (7th Cir. 1977).  "The question is not whether the indictment particularly alleges
sufficient facts from which a jury could find that the mailings charged were in furtherance of the
scheme, but rather whether the Government conceivably could produce evidence at trial showing
that the designated mailings were for the purposes of executing the scheme."  *Id.* (citing
*Sampson*, 371 U.S. at 76).

("mailings between innocent parties can support a mail fraud conviction"). *Pimental*, for example, demonstrates this principle well. There, the defendants' scheme involved misrepresentations about the nature of their company's work to reduce its workers' compensation obligations. *See* 380 F.3d at 586-88. The mailings, found to be "in furtherance of" the scheme, were mailings sent from a third-party insurer to the defendants to document the defendants' representations to the insurer about the nature of the work. *See id.* Here, defendants plainly "caused" the misrepresentations and omissions in the mailings to the SEC by disguising their related-party transactions and sales of shares from their agents at Xinhua Finance who created and mailed the reports and statements at issue, and whose mailings could reasonably be foreseen by the defendants.

### D. The mail fraud counts are not duplicitous.

#### 1. Background and Legal Principles

An indictment is impermissibly duplicitous where it combines two or more distinct crimes into one count, and the defendant is prejudiced thereby. *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001). A duplicitous indictment may potentially impair "a defendant's rights to notice of the charge against him, to a unanimous verdict, . . . and to protection against double jeopardy in a subsequent prosecution." *United States v. Crisci*, 273 F.3d 235, 238 (2d Cir. 2001) (internal quotation, citation omitted). However, it is not duplicitous to allege alternate means in a single count. Rule 7(c)(1) provides that "[i]t may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means." *See Schad v. Arizona*, 501 U.S. 624, 631 (1991) ("[w]e have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone").

Thus, "it is well established that if a criminal statute disjunctively lists multiple acts which constitute violations, the prosecution may in a single count of an indictment or information charge several or all of such acts in the conjunctive and under such charge make proof of any one or more of the acts, proof of one alone, however, being sufficient to support a conviction." *United States v. Brown*, 504 F.3d 99, 104 (D.C. Cir. 2007) (internal quotation, citation omitted); *see also id.* ("it was no error for the government to seek a conjunctively worded indictment and then ultimately secure a conviction on proof of one act alone").[43]

Because the rule prohibiting duplicity is a rule of pleading, a violation is generally not fatal to the indictment. *See United States v. Damrah*, 412 F.3d 618, 623 (6th Cir. 2005); *United States v. Robinson*, 651 F.2d 1188, 1194 (6th Cir. 1981) ("The rules about multiplicity and duplicity are pleading rules, the violation of which is not fatal to an indictment. Defendant's remedy is to move to require the prosecution to elect either the count or the charge within the count upon which it will rely."). The government may correct a duplicitous indictment by electing the basis upon which it will continue, *see, e.g.*, *United States v. Shumpert Hood*, 210 F.3d 660, 663 (6th Cir. 2000), or with a corrective instruction to the jury. *See United States. v. Swantz*, 380 Fed. Appx. 767, 768 (10th Cir. 2010) (corrective instruction is a "simple cure for duplicity"); *United States v. Rabinowitz*, 56 F.3d

---

[43]     *See also, e.g.,United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) ("where a statute defines two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count") (quotation, citation omitted); *United States v. Harvard*, 103 F.3d 412, 420 (5th Cir. 1997) ("Where a statute specifies several alternative ways in which an offense can be committed, the indictment may allege the several ways in the conjunctive, and a conviction thereon will stand if proof of one or more of the means of commission is sufficient.") (quotation, citation omitted); *United States v. Mohr*, 728 F.2d 1132, 1135 (8th Cir. 1984) (same).

932, 933 (8th Cir. 1995) (any "risk of a nonunanimous jury verdict inherent in a duplicitous count may be cured by a limiting instruction").[44]

### 2. Analysis

Defendants argue (ECF Doc. 43-1 at 17) that the mail fraud counts are duplicitous because each of the four mailings is alleged "in support of three separate and distinct prongs of a scheme," which prongs defendants further claim have additional sub-schemes. As defendants put it, "[t]hese schemes constitute different offenses and must be charged in separate counts." *Id*. In light of the well-established case law set forth above, these claims are meritless.

Preliminarily, defendants' arguments that the Indictment charges multiple schemes are at odds with their earlier concession (*id*. at 7) that "[a]ll of the prongs . . . are all part of the same alleged scheme to defraud." Not only do defendants' claims of multiple schemes run counter to their own admissions – they are also contradicted by the Indictment, which alleges (and which defendants concede must be accepted as true) a single conspiracy and scheme to defraud others and to enrich the defendants (*i.e.*, to obtain money). *See* Indictment ¶¶ 1, 59, 64 (each describing "a scheme," not multiple schemes). Tellingly, defendants cite not a single case where the Court has construed an Indictment, contrary to its own terms, to encompass multiple separate schemes under any circumstances remotely comparable to this. In reality, the multiple "sub-schemes" that defendants now purport to find in the Indictment are simply various means through which the mail fraud offenses were committed, not separate schemes. In *United States v. Foggo*, 2008 WL 2777009, slip.

---

[44]     "[I]t is well established that when the [g]overnment charges in the conjunctive, and the statute is worded in the disjunctive, the district court can instruct the jury in the disjunctive." *See also United States v. Perry*, 560 F.3d 246, 256 (4th Cir. 2009); *see also United States v. Gray*, 723 F. Supp. 2d 82, 85-86 (D.D.C. 2010) (same).

op. at *5-*7 (E.D. Va. July 14, 2008), the court analyzed – and rejected – similar claims that a unitary scheme was in fact a multitude of sub-schemes. In particular, the court noted several consideration, such as commonality of defendants in a conspiracy, commonality of victims, shared goals of the conspirators, overlap of time, and the quality, duration and frequency of each conspirators transactions that determined whether a case involved single unitary scheme. *See id.* All such factors here point to a unitary scheme, just as the Indictment alleges. The Court cannot but conclude that the Indictment here properly alleges a single scheme, and that charging various means within each mailing count is entirely appropriate.

Recognizing their argument lacks a foundation in the Indictment, the defendants attempt to create a legal distinction. Separating "a scheme to defraud" from "a scheme to obtain money," defendants argue (ECF Doc. 43-1 at 17-18) that "the mail fraud statute criminalizes two distinct offenses" and thus "the government must charge each separate fraudulent scheme in a separate count."[45] This purported distinction is (again) contradicted by their earlier recognition (*id.* at 10) that a mail fraud "scheme to defraud" must "involve[] obtaining money or property" and their claim (*id.* at 11) that "to defraud" means, like a scheme to obtain money or property, "depriving one of his property rights" (citing, *inter alia*, *United States v. Cleveland*, 531 U.S. 12, 26 (2000)).

In addition, defendants' approach was rejected by this very Supreme Court case. *See Cleveland*, 531 U.S. at 25-26 (rejecting claim that the two parts of the mail fraud statute "define[] . . . separate offense[s]"). Similarly, in the parallel context of bank fraud, numerous Courts of Appeal have held that "a single count of an indictment may charge bank fraud under both" parts of

---

[45]     Defendants then purport (*id.* at 18-19) to find "confusing" whether each of parts (a), (b), and (c) in Paragraph 64 can be classified as either a scheme to defraud or a scheme to obtain money. As set forth above, this feckless exercise is irrelevant.

18 U.S.C. § 1344, "a scheme to defraud a financial institution" and "a scheme to obtain a financial

institution's money." *Crisci*, 273 F.3d at 238 (collecting cases from the 1st, 2d, 3d, 4th, 6th and 7th

Circuit Courts of Appeal).  Though charged conjunctively, at trial "proof of the violation of either

subsection is sufficient to support a conviction." *Id.*; *cf. United States v. Males*, 459 F.3d 154, 157-

158 (2d Cir. 2006) (reading *Cleveland* to require that the parallel wire fraud statute's "scheme"

language be read conjunctively).[46]

     In short, because there is but a single scheme alleged, defendants' fears of jury confusion and

prejudice (ECF Doc. 43-1 at 19-20) are misplaced.  Moreover, any such confusion could easily be

addressed by appropriate jury instructions.[47]

---

[46]     Defendants (ECF Doc. 43-1 at 17) cite *United States v. Cronic*, 900 F.2d 1511,
1513 (10th Cir. 1990).  However, *Cronic* did not hold, as defendants claim, that a "scheme to
defraud" and a "scheme to obtain money" must be charged in separate counts; *Cronic* did not
address the duplicity question at all.  Instead, it implicitly *approved* the indictment in that case,
which charged both "a scheme and artifice to defraud *and* to obtain money." *Id.* at 1513-14
(emphasis added). The defect in *Cronic* was not that the Indictment was duplicitous, but
"stem[med] from the fact that . . . the jury [was] instructed only as to the offense of obtaining
money by means of false or fraudulent pretenses or representations," and therefore the
government could not argue on appeal that the facts at trial established a "scheme to defraud." *Id.*
at 1514.  Indeed, the Tenth Circuit rejected the very construction defendants attempt to put on
*Cronic*, holding that "when both a scheme to defraud and to obtain money are charged in one
indictment or in a single count and are connected in the conjunctive, they are not duplicitous, and
it will suffice to prove any one or more of the charges." *United States v. Lefebvre*, 189 Fed.
Appx. 767, 772 (10th Cir. 2006); *see also United States v. Trammell*, 133 F.3d 1343, 1354-55
(10th Cir. 1998).  Notably, in reviewing *Cronic* and other cases advanced by defendants, the
Court in *Foggo*, observed that defendants could not identify "a single case where a court actually
struck down as duplicitous an indictment that alleged both types of mail and wire fraud schemes
in the same count."  2008 WL 2777009, at *5-*7.

[47]     Even were the Court to find that the Indictment charges a scheme with multiple
subparts, that would not render it impermissibly duplicitous.  "[W]here a mail fraud count alleges
only one instance of use of the mail in furtherance of multiple schemes (or a single scheme with
multiple objects), the jury can find the defendant guilty of only one mail fraud offense on that
count – regardless whether the jury finds that the defendant devised one or all of the alleged
schemes associated with that particular use of the mail." *United States v. Caldwell*, 302 F.3d 399,

**IX.     The Indictment Should Not be Dismissed for Lack of Venue. [Opp. to ECF Doc. 48-1]**

The defendants have moved to dismiss the Indictment for lack of venue.  *See* ECF Doc. 48-1.

Both the U.S. Constitution and Fed. R. Crim. P. Rule 18 provide that a person can be tried

for a crime only where that crime was committed.  *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998).

The Constitution requires that all criminal trials "shall be held in the State where the said Crimes

shall have been committed."  U.S. Const. art. III, § 2, cl. 3.  The Sixth Amendment guarantees that

"[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an

impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const.

amend. VI.  Rule 18 of the Federal Rules of Criminal Procedure likewise provides that "[u]nless a

statute or these rules permit otherwise, the government must prosecute an offense in a district where

the offense was committed."  Fed. R. Crim. P. 18.  Moreover, "the locus delecti [of the crime

charged] must be determined from the nature of the crime alleged and the location of the act or acts

constituting it."  *Cabrales*, 524 U.S. at 6-7.  In determining a crime's "locus delecti," a court should

"initially identify the conduct constituting the offense (the nature of the crime) and then discern the

location of the commission of the criminal acts."  *United States v. Rodriquez-Moreno*, 526 U.S. 275,

279 (1999).  Because venue is not an element of a crime, the government must prove venue by a

preponderance of evidence.  *United States v. Lam Kwong-Wah*, 924 F.2d 298, 301 (D.C. Cir. 1991).

**A.     The Indictment Sufficiently Alleges Venue for the Mail Fraud Counts in the District of Columbia**.

The locus for mail fraud prosecutions is confined to "those districts in which a proscribed

act occurs, *i.e.*, in which the defendant 'places,' 'deposits,' 'causes to be deposited,' 'takes,' or

---

408 (5th Cir. 2002).

'receives' mail or 'knowingly causes' mail 'to be delivered.'" *United States v. Brennan*, 183 F.3d

139, 147 (2d Cir. 1999) (quoting 18 U.S.C. § 1341).

Here, the proscribed use of the mails was the defendants' causing Xinhua Finance to furnish

statements to the SEC in the District of Columbia that misrepresented and failed to disclose certain

allegedly material information. *See* Indictment ¶¶ 36, 48, 57, 61.g, 61.h, and 64. The Indictment

also alleged that the defendants aided and abetted the mail fraud violation. *Id.* ¶ 64. For purposes

of their motion to dismiss, the defendants do not dispute that the Indictment alleges that the reports

were received by the SEC in the District of Columbia via the mails, or that the Indictment alleges

that the defendants caused those mailings. *See* ECF Doc. 48-1 at p. 3. Instead, the defendants argue

that the Indictment fails to allege the requisite conduct necessary to establish venue for mail fraud

because it does not allege that the defendants reviewed or approved the original reports filed with

the Japanese regulators or knew that Xinhua Finance was later mailing English versions of those

reports to the SEC. *Id.* There is no requirement, however, that the government allege the defendants

had actual knowledge of the mailings or specifically intended to use the mails.

The elements of the offense of mail fraud "are (1) a scheme to defraud, and (2) the mailing

of a letter, etc., for the purpose of executing the scheme." *Pereira v. United States*, 347 U.S. 1, 8

(1954). "It is not necessary that the scheme contemplate the use of the mails as an essential

element." *Id.* Although "the use of the mails need not be an essential element of the [fraudulent]

scheme," *Schmuck v. United States*, 489 U.S. 705, 710 (1989), court decisions focus on the use of

the mails, which is essential to federal jurisdiction, rather than the location of any foreseeable victim.

*See United States v. Monostra*, 125 F.3d 183, 187 (3d Cir. 1997) (comparing the mail and wire fraud

66

statutes to the bank fraud statute; commenting that "the mail and wire fraud statutes do not penalize the victimization of specific persons; rather, they are directed at the instrumentalities of fraud").

The Indictment also alleges that the defendants "caused" the mailings.  In *Pereira*, the Court explained what it meant for a person to cause the use of the mails in the following way:

> Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he "causes" the mails to be used.

*Id.* at 8-9 (citing *United States v. Kenofskey*, 243 U.S. 440 (1917)).[48]

As a result, the government need not allege (or prove) that the defendants mailed anything themselves, *United States v. Shaid*, 730 F.2d 225, 229 (5th Cir. 1984), nor that they intended the mails be used to carry out the fraud, *United States v. Locklear*, 829 F.2d 1314, 1318 (4th Cir. 1987) (defendant convicted of mail fraud where subsequent purchaser of vehicle with fraudulent odometer obtained title by mail).[49]  Because the Indictment alleged a scheme to defraud and alleged that the

---

[48]     In *Pereira*, the Court upheld the mail fraud conviction for the co-defendant, Brading, under an aiding and abetting charge even though Brading was even further removed from the mailing than his co-defendant, Perreira.  *Id.* at 10-11 ("ample evidence of the [defendants'] collaboration and close cooperation in the fraud from which the jury could conclude that Brading aided, abetted, or counseled Pereira in the commission of the specific acts charged") (citing *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949) ("In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to succeed.'")) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (1938)).

[49]     *See also United States v. Davidson*, 760 F.2d 97, 99 (6th Cir. 1985) ("Mail fraud only requires that the defendant reasonably anticipate, or as a reasonable person foresee, the use of the mails."); *United States v. Craig*, 573. F.2d 513, 519 (7th Cir. 1978) ("because the use of the mails for purposes of delivering the demanded money was reasonably foreseeable, defendants are accountable for that use of the mails under the mail fraud statute even though they did not personally use or intend to use the mail to further the scheme"); *United States v. Shepherd*, 511 F.2d 119, 121 (5th Cir. 1975) ("it is not necessary that the defendant himself place the matter into a mail depository, only that he have a reasonable basis to foresee that the mails will be used").

defendants caused Xinhua Finance to use the mails as part of the Company's efforts to establish ADRs through the SEC in the District of Columbia (as a reasonable person could foresee), the Indictment sufficiently alleges venue for mail fraud and aiding and abetting mail fraud.  *See United States v. Trie*, 21 F. Supp. 2d 7, 18 (D.D.C. 1998) ("So long as the offense has some minimal contacts with the district, a crime can be committed in a district other than the location of the defendant's acts."); *United States v. Kilpatrick*, 458 F.2d 864, 868 (7th Cir. 1972) (venue for aiding and abetting is available where the crime abetted was perpetrated even though the defendant acted elsewhere).

**B.     The Indictment Sufficiently Alleges Venue for False Statements in the District of Columbia.**

Contrary to the defendants' arguments, the government is not required to allege in a prosecution under Section 1001 that the defendants "had knowledge that reports generated for the Japanese regulators would ultimately be sent to the SEC."  *See* ECF Doc. 48-1 at p. 5.  Venue in false statements cases under Section 1001 is appropriate in any district to which the false statement ultimately is forwarded, even if by a person other than the defendant.  *United States v. Hsia*, 24 F. Supp. 2d 14, 23 (D.D.C. 1998) (citing cases).  Here, the Indictment alleged that the defendants caused Xinhua Finance to furnish the false statements to the SEC in the District of Columbia.  *See* Indictment ¶¶ 36, 48, 57, 61.g, 61.h, 66, 68, 70, and 72.  The Indictment also alleged that the defendants aided and abetted the submission of the false statements to the SEC.  *Id.* ¶¶ 66, 68, 70, and 72.

Courts are reluctant to imply a foreseeability requirement to allegations of venue in light of the fact that it "is well settled that mens rea requirements typically do not extend to the jurisdictional elements of a crime."  *United States v. Cooper*, 482 F.3d 658, 664 (4th Cir. 2007).  Venue is similar

in nature to a jurisdictional element, and "typically lacks any sort of explicit knowledge or foreseeability prerequisite."  *United States v. Johnson*, 510 F.3d 521, 527 (4th Cir. 2007) (citing *United States v. Perez*, 280 F.3d 318, 330 (3d Cir. 2002) (noting that venue is "an element more akin to jurisdiction than to the substantive elements of the crime")) (quoting *United States v. Massa*, 686 F.2d 526, 530 (7th Cir. 1982)).  Rule 18 provides no mens rea requirement.  Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.").[50]

The fact that false statements are considered continuing offenses under 18 U.S.C. § 3237(a) also argues in favor of not requiring a foreseeability requirement to allege venue under the false statements statute.  Under Section 3237(a), an offense against the United States begun in one district and completed in another, or committed in more than one district, may be prosecuted in any district in which such offense was "begun, continued, or completed."  18 U.S.C. § 3237(a).  There is no separate mens rea requirement under Section 3237(a).  Instead, as a continuing offense, venue is properly laid in "the whole area through which force propelled by an offender operates."  *See United States v. Candella*, 487 F.2d 1223,1227-28 (2d Cir. 1974).  As alleged, the force propelled here by

---

[50]    Circuits that have addressed the issue in terms of whether the government must prove foreseeability in the context of mail fraud and related offenses are split on the matter. *Compare United States v. Angotti*, 105 F.3d 539, 543 (9th Cir. 1997) (holding that "[i]t is irrelevant whether [the defendant] subjectively knew the identity or location of [a bank] official" for the purposes of venue in a false statement prosecution under 18 U.S.C. § 1014), and *United States v. Goldberg*, 830 F.2d 459, 465 (3d Cir. 1987) (indicating that it was unnecessary in a wire fraud prosecution to determine whether the defendant could have reasonably foreseen that a wire transfer would pass through the relevant district), *with United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) (holding that "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue").

the defendants' efforts to establish ADRs intending to reach a wider range of U.S. investors flowed both foreseeably[51] and ultimately to the SEC in the District of Columbia.

### C.     The Indictment Sufficiently Alleges Venue for Conspiracy in the District of Columbia.

It is a well-established rule that "a conspiracy prosecution may be brought in any district in which some overt act in furtherance of the conspiracy was committed by any of the co-conspirators." *United States v. Rosenberg*, 888 F.2d 1406, 1415 (D.C. Cir. 1989). "It is not necessary that [the defendant] himself have entered or otherwise committed an overt act within the district, as long as one of his coconspirators did." *United States v. Angotti*, 105 F.3d 539, 545 (9th Cir. 1997) (quoting *United States v. Corona*, 34 F.3d 876, 879 (9th Cir. 1994)). Indeed, "an innocent act by a third party, if caused by previous act or contact on the part of the conspirators," constitutes an overt act in furtherance of a conspiracy. *United States v. Johnson*, 165 F.2d 42, 45 (3d Cir. 1948); *see also Hyde v. United States*, 225 U.S. 347, 360 (an overt act to influence agency action "might be through deception, it might be through fraud, or it might be through innocent agents and acts of themselves having no illegality, but effectually causing and moving official action to the consummation of the end designed and contemplated"). The crime of conspiracy is also a continuing offense, the prosecution of which is proper "in any district in which such offense was begun, continued or completed." *United States v. Tannenbaum*, 934 F.2d 8, 12 (2d Cir. 1991) (quoting 18 U.S.C. § 3237(a)). Further, "[a]n aider and abettor may be tried in the district in which the principal

---

[51]     As discussed above, the SEC's records evidence the electronic signatures of Singhal, Bush, and Pelino on the Form F-6 to establish Xinhua Finance's ADRs, which was filed with the SEC in July 2005 to register 20,000,000 ADRs. A copy of the Form F-6 is available at: http://www.sec.gov/Archives/edgar/data/1287221/000101915505000153/xinhuaf6.htm.

committed the offense." *United States v. Brantley*, 733 F.2d 1429, 1434 (11th Cir. 1984) (citing cases

holding similarly).

Here, the Indictment alleged several overt acts in furtherance of the conspiracy in the District

of Columbia. The Indictment alleged, for example, that Singhal, Bush, and another attempted to sell

Xinhua Finance shares transferred by Bush to Singhal's control to an investor in the District of

Columbia. *See* Indictment ¶¶ 62.z-ff.[52] The Indictment also alleged that the defendants caused

Xinhua Finance to furnish reports to the SEC in the District of Columbia. *See* Indictment ¶¶ 62.bbb-

hhh.[38] Those allegations were sufficient to allege venue for conspiracy in the District of Columbia.

---

[52]    The defendants' unsupported contention that such conduct "cannot form the basis
for venue in the District of Columbia because the communications, according to the Indictment
itself, were in furtherance of a transaction that was never consummated and did not further any
alleged conspiracy," *see* ECF Doc. 48-1 at p. 6, misstates the Indictment and the law. The
Indictment specifically alleged that such overt acts were "[i]n furtherance of the conspiracy and
to accomplish the objects thereof." Indictment ¶ 62. The fact that an overt act in furtherance of a
conspiracy did not result in a consummated transaction does not matter. *Yates v. United States*,
354 U.S. 298, 334 (1957) ("function of the overt act in a conspiracy prosecution is simply to
manifest 'that the conspiracy is at work,' and is neither a project still resting solely in th minds of
the conspirators nor a fully completed operation no longer in existence") (quoting *Carlson v.
United States*, 187 F.2d 366, 370 (10th Cir. 1951)); *United States v. Root*, 366 F.2d 377, 383 (9th
Cir. 1966) ("Title 18 U.S.C. § 371 does not require 'mission accomplished,' only 'mission
attempted.' An overt act by the conspirators in an effort to accomplish the mission satisfies the
requirement of the statute.").

[38]    There is no requirement that the government allege (or prove) that the location of
an overt act was foreseeable to a conspirator. *See Lam Kwong-Wah*, 924 F.2d at 301 (noting in
passing that venue was proper for a conspirator whose only actions were in another district, who
joined the conspiracy after the only acts in venue were complete, and who played only a "small
supporting role" in the conspiracy); *see also United States v. Castaneda*, No. 07-4106, 2009 WL
530132, at ** 5-6 (6th Cir. Mar. 4, 2009) (declining to adopt foreseeability as an additional
element of venue for conspiracy to possess and distribute drugs); *United States v. Hull*, 419 F.3d
762, 768 (8th Cir. 2005) (finding venue proper in drug conspiracy because supplier assumed the
risk that large shipments of drugs would be distributed in other states); *Angotti*, 105 F.3d at 545
(finding that the cited authorities do not require foreseeability to establish venue for a
conspiracy); *United States v. Lester*, 282 F.2d 750, 753 (3d Cir. 1960) (finding venue proper
because conspirator had knowledge that subject of conspiracy would be transported out of state).

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny the defendants' motions to dismiss.

Respectfully submitted,

ROBERT OKUN
Acting United States Attorney
In and For the District of Columbia


By:  _____
MICHAEL K. ATKINSON
JONATHAN HOOKS
Assistant United States Attorneys
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C.  20530
202.252.7817 (Atkinson)
202.252.6731 (Hooks)
Michael.Atkinson2@usdoj.gov
Jonathan.Hooks@usdoj.gov

DATED: February 27, 2012